Miller v. CBC Companies                    CV-95-24-SD    11/29/95 P

UNITED STATES DISTRICT COURT FOR THE

DISTRICT OF NEW HAMPSHIRE


Susan Y. Miller;
Michael B. Miller

    v.                                              Civil No. 95-24-SD

CBC Companies, Inc.;
Credit Bureau Services of NH, Inc.;
William B. Price;
William H. Price


O R D E R


In this civil action, plaintiffs Susan Y. Miller (Miller) and Michael B. Miller seek recovery from defendants CBC Companies, Inc. (CBC); Credit Bureau Services of New Hampshire, Inc. (CBS), a subsidiary of CBC; William B. Price, owner and chairman of the board of CBC and CBS; and William H. Price, owner of CBC and CBS. Plaintiff Susan Miller brings the following claims: (1) sexual discrimination in violation of Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e, et seq. (Count I); (2) discrimination due to association with a disabled individual in violation of Title I of the Americans with Disabilities Act, 42 U.S.C. § 12111, et seq. (ADA) (Count II); (3) breach of contract and wrongful discharge (Count III); (4) intentional infliction of emotional distress (Count IV); and (5)

reckless infliction of emotional distress (Count V). Plaintiff's husband, Michael Miller, brings a separate claim for loss of consortium (Count VI).

Presently before the court is defendants' motion to dismiss Counts II, III, IV, V, and VI of the complaint, pursuant to Rule 12(b)(6), Fed. R. Civ. P.

<u>Factual Background and Procedural History</u>

In 1983 CBS hired Susan Miller and soon after promoted her to a management position.[1] While on maternity leave in 1992 after giving birth to twins, she asked that she be considered for another promotion. Complaint ¶ 22. Her employer instead gave the position to a female co-worker with five years less seniority than Miller. <u>Id.</u> ¶ 22. Miller alleges that when returned from her leave, she was further denied growth opportunities and also received undue criticism of her work. <u>Id.</u> ¶¶ 24, 38. Eventually, in late December 1993, her employer formally terminated Miller's employment, citing "a difference in philosophy." <u>Id.</u> ¶ 26.

The complaint alleges that lurking behind these unfavorable employment actions was unlawful discrimination in violation of,

_____

[1]She was subsequently promoted again in 1987 to the position of Bureau Manager.

2

inter alia, the ADA.  Defendants allegedly discriminated against her on the basis of her association with her oldest son, who has Down's Syndrome.  In 1988, shortly after her son was born, defendant William B. Price allegedly began to question Miller's commitment to the company.  Complaint ¶ 20.  Price also allegedly made comments such as that women should stay at home while their husbands worked to provide for the family.  Complaint ¶ 21.  Furthermore, when Miller was passed over for the promotion in 1992, both William B. Price and William H. Price allegedly stated that her parental obligations to her disabled son made her unpromotable within the company.  Complaint ¶¶ 40, 41.

On February 28, 1994, Miller filed a charge of discrimination (original charge) with the New Hampshire Commission for Human Rights (NHCHR) and the Equal Employment Opportunity Commission (EEOC), alleging that her employer's conduct in refusing to promote her and ultimately in terminating her was due to sex discrimination, under the theory that her employer considered her three children when it made personnel decisions and did not consider the family obligations of similarly situated male employees.  On May 10, 1994, Miller amended the charge to include a claim under the ADA for discrimination based on her association with her disabled son.

After the EEOC investigated the matter and issued a right-

3

to-sue letter, plaintiffs filed the instant action in this court on January 17, 1995.

## 1. Rule 12(b)(6) Standard

To resolve defendants' Rule 12(b)(6) motion, the court must "take the well-pleaded facts as they appear in the complaint, extending plaintiff every reasonable inference in [her] favor." Pihl v. Massachusetts Dep't of Educ., 9 F.3d 184, 187 (1st Cir. 1993) (citing Coyne v. City of Somerville, 972 F.2d 440, 442-43 (1st Cir. 1982)). A Rule 12(b)(6) dismissal is appropriate "'only if it clearly appears, according to the facts alleged, that the plaintiff cannot recover on any viable theory.'" Garita Hotel Ltd. Partnership v. Ponce Fed. Bank, F.S.B., 958 F.2d 15, 17 (1st Cir. 1992) (quoting Correa-Martinez v. Arrillaga-Belendez, 903 F.2d 49, 52 (1st Cir. 1990)).

## 2. Americans with Disabilities Act

Plaintiff alleges that defendants' conduct in refusing to promote her and in ultimately terminating her employment violated the ADA. Defendants challenge the ADA claim on the following grounds: (a) plaintiff failed to file a timely charge of discrimination with the EEOC and to exhaust her administrative

4

remedies; (2) the claim is time-barred because it is based on conduct that occurred prior to the effective date of the ADA; and (3) the claims against defendants William B. Price and William H. Price are barred because the ADA does not provide for individual liability.

### a. Timeliness of EEOC Charge/Exhaustion of Remedies

Defendants first contend that the ADA claim is time-barred. They further argue that plaintiff failed to exhaust her administrative remedies, as aspects of her civil claim go beyond the scope of her EEOC charge. In making both arguments, defendants assert that plaintiff never claimed in an EEOC charge that her December 1993 termination was due to disability discrimination. Prior to filing a civil action under the ADA, an aggrieved party must, inter alia, file an administrative charge with the EEOC.[2] The filing of a charge serves the dual

_____

[2]The EEOC charge should be filed within 300 days of the alleged discriminatory act. The relevant statute, in pertinent part, states:

> [I]n a case of unlawful employment practice with respect to which the person aggrieved has initially instituted proceedings with a State or local agency with authority to grant or seek relief . . ., such charge shall be filed by or on behalf of the person aggrieved within three hundred days after the alleged

5

purpose of giving

the employer notice of plaintiff's charges and providing the agency with information and "an opportunity to eliminate the alleged unlawful practices through informal methods of conciliation." Powers v. Grinnell Corp., 915 F.2d 34, 37 (1st Cir. 1990) (citation omitted). The administrative charge affords "'the EEOC with a "jurisdictional springboard"'" to investigate the alleged discrimination. Id. at 38 (quoting EEOC v. General Electric Co., 532 F.2d 359, 364 (4th Cir. 1976) (quoting EEOC v. Huttig Sash & Door Co., 511 F.2d 453, 455 (5th Cir. 1975))). Thus, "[a]n administrative charge is not a blueprint for the litigation to follow," nor need the exact wording of the charge exactly predict the subsequent judicial pleading. Id. Instead, plaintiff's civil claims must merely "come within the 'scope of the EEOC investigation which can reasonably be expected to grow out of the charge of discrimination.'" Id. at 39 (quoting Sanchez v. Standard Brands, Inc., 431 F.2d 455, 466 (5th Cir. 1970)) (emphasis added).

In the amended charge, plaintiff makes the following allegation: "I believe my differing treatment after my return

---

unlawful employment practice occurred . . . .
42 U.S.C. § 2000e-5(e). This clause is applicable as plaintiff initially filed a charge with NHCHR.

6

from maternity leave resulting in adverse evaluations were due to stereotyping based on illegal sex and disability discrimination." See May 10, 1994, Charge of Discrimination ¶ 12 (attached as Exhibit 2 to Objection to Defendants' Motion to Dismiss). Moreover, plaintiff's submission in support of her charge, which defendants received, notes that "CBC saw me as extra baggage to be done away with because I had family obligations, including twins and a handicapped child." See Plaintiff's Information Response at 8 (attached as Exhibit 3 to Objection to Defendants' Motion to Dismiss).

In addition, plaintiffs' ADA claim arises from essentially the same facts as the original EEOC charge for sex discrimination, which expressly set forth a claim for unlawful termination. Indeed, the ADA claim could be construed as a further refinement of the sex discrimination charge which, like the ADA claim, alleges that defendants were motivated by plaintiff's parental responsibilities when they failed to promote her and eventually terminated her.

The court finds and rules that plaintiff's EEOC charge gave defendants sufficient notice that she would potentially bring an ADA claim for her termination. As the EEOC charge was filed

7

within the 300-day time limit,[3] plaintiff's ADA claim is not time-barred to the extent it relates to her termination. Moreover, defendants have not succeeded in showing plaintiff failed to exhaust her administrative remedies. The ADA claim could "reasonably be expected to grow out of the charge of discrimination," Powers, supra, 915 F.2d at 38 (quotation omitted) and therefore was within the scope of the EEOC charge.[4]

b.  Retroactivity of the ADA

Defendants next argue that the ADA claim must be dismissed because the alleged failure to promote occurred prior to the date the ADA became effective for most employment actions, July 26, 1992. Although the alleged failure to promote occurred in April 1992, the alleged discriminatory termination occurred in December 1993, well after the ADA's effective date. Accordingly, to the extent the ADA claim is based on plaintiff's termination,

_____

[3]Plaintiff was terminated in December of 1993 and then filed EEOC charges in February and May of 1994.

[4]Defendants further argue that the portion of plaintiffs' claim relating to the failure to promote is time-barred, as this occurred in April 1992 and more than 300 days elapsed before plaintiff filed a charge. Plaintiff avers that her claim for failure to promote was timely filed because it was part of a continuing violation. The court need not address this issue, given its ruling that this portion of plaintiff's claim should be dismissed because it occurred prior to the effective date of the ADA. See infra part 2.b.

8

defendants' motion to dismiss must be denied.

However, whether plaintiff can be compensated for the alleged failure to promote, which occurred prior to the ADA's effective date, presents a more difficult question. The United States Supreme Court recommends a two-step inquiry to approach the retroactivity question: (1) whether Congress has "expressly prescribed the statute's proper reach" so as to displace the presumption against retroactivity and (2) if not, whether, in the court's determination, "the new statute would have retroactive effect". <u>Landgraf v. USI Film Prods.</u>, ___ U.S. ___, ___, 114 S. Ct. 1483, 1505 (1994). If Congress did not clearly intend that the statute apply retroactively, and if the new statute would so operate, courts must apply the "traditional presumption" against retroactivity and find the statute does not govern. <u>Id.</u>

### (1) Retroactivity

Absent a clear statement of congressional intent, there is a traditional presumption against giving retroactive effect to statutes that burden private rights. <u>Landgraf</u>, <u>supra</u>, ___ U.S. at ___, 114 S. Ct. at 1499. The court must determine whether Congress intended the ADA, which obviously affects the substantive rights of the parties, to apply retroactively.

Most courts addressing the issue agree that Congress did not

9

intend the ADA to apply to discriminatory conduct occurring prior to its effective date.  See, e.g., Graehling v. Village of Lombard, 58 F.3d 295, 296 (7th Cir. 1995); Burfield v. Brown, Moore & Flint, Inc., 51 F.3d 583, 588 (5th Cir. 1995) ("The ADA is not retroactive and it does not apply to actions allegedly taken prior to the effective date of the Act."); Vande Zande v. Wisconsin Dep't of Admin., 44 F.3d 538, 545 (7th Cir. 1995); O'Bryant v. City of Midland, 9 F.3d 421, 422 (5th Cir. 1993); Bishop v. Okidata, Inc., 864 F. Supp. 416, 420-22 (D.N.J. 1994); Gonzales v. Garner Food Servs., Inc., 855 F. Supp. 371, 373 (N.D. Ga. 1994) (noting that courts have uniformly construed Title 1 of the ADA to have prospective application); Raya v. Maryatt Indus., 829 F. Supp. 1169, 1172-75 (N.D. Cal. 1993) (reviewing jurisdictions that have held ADA does not apply retroactively and providing extensive analysis of the issue).

The ADA provides that Title 1 "shall become effective 24 months after the date of enactment [July 26, 1990]."  Section 108 of Pub. L. 101-336, U.S.S.C.A.N. (104 Stat.) 337.  Courts have interpreted this section to mean that Title 1 should only apply to conduct occurring after July 26, 1992.  Bishop, supra, 864 F. Supp. at 421 ("Congress's postponing of the effective date evidences an intent not to apply the new regulations until their

10

effective date."); <u>Gonzales</u>, <u>supra</u>, 855 F. Supp. at 373.[5]

In arguing that the ADA is retrospective, plaintiff attempts to resurrect arguments unsuccessfully employed by the plaintiffs in <u>Landgraf</u> when they contended that section 102 of the Civil Rights Act of 1991 should be applied retroactively. Plaintiff contends that as Congress specifically indicated in statutory notes that an amendment to the ADA, section 109(c) of the 1991 Civil Rights Act, 42 U.S.C. § 12112(c), relating to foreign countries, should be applied prospectively, this implies that the rest of the Act was meant to operate retrospectively. <u>See</u> Objection at 12-13. According to plaintiff, an interpretation that the <u>entire</u> Act applies prospectively would render the notes to section 109(c) redundant, a result that runs counter to the rules of statutory construction.[6]

The <u>Landgraf</u> court rejected the idea that such a "negative inference" could be drawn from the language of section 109(c),

_____

[5]Further support for this conclusion can be found in dicta of the United States Supreme Court: "A statement that a statute will become effective on a certain date does not even arguably suggest that it has any application to conduct that occurred at an earlier date." <u>Landgraf</u>, <u>supra</u>, ___ U.S. at ____, 114 S. Ct. at 1493.

[6]Plaintiff also argues Congress would have expressly indicated the entire Act be applied prospectively if it had so intended. This argument does not hold up, given the "traditional presumption" against retroactivity.

11

finding that such evidence would be "a surprisingly indirect route to convey an important and easily expressed message" concerning the Act's retroactivity. Landgraf, supra, ___ U.S. at ____, 114 S. Ct. at 1494-96. Rather, the Court considered it more likely to support that the legislators "agreed to disagree," id. at 1496, about the retroactive effect of the Act, and decided to leave the question to the courts. Id. at 1494, 1495. See also Raya, supra, 829 F. Supp. at 1174 (section 109(c) "was part of an entirely separate statute and was added to the ADA after its enactment," and, as such, "the presence of section 109(c) does not indicate that Congress intended the remainder of the ADA to apply retroactively").

In addition, plaintiff, noting that the ADA has a delayed effective date, argues[7] that the date of the Act's enactment, July 26, 1990, controls. This position is unpersuasive in light of the principle that "the legal effect of conduct should ordinarily be assessed under the law that existed when the conduct took place . . . ." Landgraf, supra, ___ U.S. at ____, 114 S. Ct. at 1497 (quotation omitted); accord Bishop, supra, 864 F. Supp. at 421 (specifically holding that ADA does not apply to

_____

[7]Plaintiff also cites Clarkson v. Coughlin, 145 F.R.D. 339, 348 (S.D.N.Y. 1993), in which the court permitted intervenors to amend their complaint to include a claim that pre-Act conduct violated the ADA. However, Clarkson does not provide analysis on the retroactivity question.

12

conduct occurring after enactment but before effective date).

Moreover, plaintiff does little to further her argument when she resorts to the proposition that "a court is to apply the law in effect at the time it renders its decision . . . ." See Bradley v. Richmond School Bd., 416 U.S. 696, 711 (1974). As Landgraf has clarified, the Court in Bradley "did not intend to displace the traditional presumption against applying statutes affecting substantive rights, liabilities, or duties to conduct arising before their enactment."[8] Landgraf, supra, ___ U.S. at ____, 114 S. Ct. at 1504 (citation omitted). Accordingly, the court finds no clear expression by Congress that the ADA be retroactively applied.

### (2) 'Retroactivity' and the Continuing Violation Theory

The court now addresses the second step prescribed by Landgraf; i.e., whether the application of the ADA here would result in a "retroactive" effect. Landgraf provides some general guidelines that determine whether a provision is being applied "retroactively." The court should consider "whether [the statute] would impair rights a party possessed when he acted,

---

[8]Unlike the statutes in question in Landgraf and here, Bradley concerned the issue of attorney's fee determinations, which, according to the Supreme Court, are "collateral to the main cause of action," Landgraf, supra, ___ U.S. ____, 114 S. Ct. at 1503, and therefore have less impact on substantive rights.

13

increase a party's liability for past conduct, or impose new

duties with respect to transactions already completed."

Landgraf, supra, ___ U.S. at ____, 114 S. Ct. at 1505.

Plaintiff invokes the continuing violation theory to argue

that even assuming the nonretroactivity of the ADA, she may

recover for defendant's alleged discriminatory pre-Act conduct.

Noting that the ADA clearly applies to the December 1993

termination, plaintiff contends the ADA should also be applied to

the promotion pass-over since these violations were of a

continuing nature.

Plaintiff's argument raises the question of whether the

failure to promote her was a "completed act" that occurred prior

to the effective date of the ADA, or whether, instead, it was

part of one continuing wrong culminating in her ultimate

termination.  Accepting, arguendo, the latter theory, the ADA

would not be applied retroactively, but, rather, prospectively to

one continued violation.

Given Lamphere v. Brown Univ., 685 F.2d 743, 751 (1st Cir.

1982), and Bazemore v. Friday, 478 U.S. 385 (1986),[9] there is

little doubt the First Circuit would decline to extend the

_____

[9]Although Bazemore and Lamphere concern the remedies
available under Title VII of the Civil Rights Act of 1964, § 701,
et seq., as amended, 42 U.S.C.A. § 2000e, et seq., their holdings
apply directly to the case at bar because ADA remedies are
coextensive with those of Title VII.  See 42 U.S.C. § 12117(a).

14

continuing violation theory to permit Miller to recover for the defendants' pre-ADA conduct.[10]  _Lamphere_ involved a sex discrimination claim brought by a professor at Brown University pursuant to Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e, _et_ _seq_, as amended, which first became applicable to educational institutions in March 24, 1972, _see_ Pub. L. No. 92-261, 86 Stat. 103.  This amendment to Title VII has prospective application.  _Lamphere_, _supra_, 685 F.2d at 747.  Plaintiff's complaint arose from defendant's alleged discriminatory salary practices which spanned from 1969 to 1978.  While noting that "a decision to hire an individual at a discriminatorily low salary can, upon payment of each subsequent pay check, _continue_ to violate the employee's rights," _id._ (emphasis added), the court concluded that plaintiff "cannot recover damages for any discrimination she might have suffered prior to March 24, 1972 [the effective date of the Act],"[11] _id._

---

[10]Further support can be found in the wording of the continuing violation theory itself.  To establish a serial violation (as opposed to a systemic violation), a party must show "'a number of discriminatory acts emanating from the same discriminatory animus, each act constituting a separate [actionable] wrong.'"  _Muniz-Cabrero v. Ruiz_, 23 F.3d 607, 610 (1st Cir. 1994) (quoting _Jensen v. Frank_, 912 F.2d 517, 522 (1st Cir. 1990)) (emphasis added).  Where pre-Act conduct is at issue, a plaintiff obviously cannot establish a separate _actionable_ wrong, because it was not unlawful at the time of commission.

[11]Although plaintiff may not recover damages for pre-Act violations, evidence of such conduct may be relevant to show "a

Subsequently, the United States Supreme Court in <u>Bazemore</u> addressed the issue of whether public employees could recover damages for salary disparities that occurred prior to 1972, when Title VII was extended to public employers.  The Court stated,

> A pattern or practice that would have constituted a violation of Title VII, but for the fact that the statute had not yet become effective, became a violation upon Title VII's effective date, and to the extent an employer continued to engage in that act or practice, it is liable under that statute. While recovery may not be permitted for pre-1972 acts of discrimination, to the extent that this discrimination was perpetuated after 1972, liability may be imposed.

<u>Bazemore</u>, <u>supra</u>, 478 U.S. at 395.

In addition, other jurisdictions have expressly declined to apply the continuing violation theory to conduct pre-dating a statute.[12]  <u>See, e.g.</u>, <u>Bishop</u>, <u>supra</u>, 864 F. Supp. at 421 n.2

---

pattern of illegal conduct, purpose or motivation with regard to independent violations that occurred after the effective date of the Act."  <u>Lamphere</u>, <u>supra</u>, 685 F.2d at 747.

[12]Courts on occasion cite to the continuing violation theory when deciding whether civil rights statutes apply to conduct antedating the act.  For example, in <u>Boyle v. Brown Univ.</u>, 881 F. Supp. 747, 750-752 (D.R.I. 1995), the court impliedly recognized that ADA claims deriving from acts occurring before the Act's effective date could be pursued if they were part of a continuing violation.  Instead of rejecting the applicability of the continuing violation theory out of hand, the court applied the principle to determine whether plaintiff's ADA claim could include pre-Act conduct.  Ultimately, the court rejected plaintiff's argument because plaintiff improperly alleged the existence of an ongoing violation.  <u>Id.</u> at 752.  <u>See also</u> <u>Park v. Howard Univ.</u>, 863 F. Supp. 14, 15-17 (D.D.C. 1994) (applying

16

(holding ADA does not permit recovery for acts occurring prior to its effective date even if they continue beyond this time); Voytek v. University of Cal., Civ. No. C-92-3465 EFL, 1994 WL 478805, at *21 (N.D. Cal. Aug. 25, 1994); see also Ascolese v. Southeastern Pa. Transp. Auth., Civ. No. 93-1461, 1995 WL 579948, at *5 (E.D. Pa. Sept. 28, 1995) (holding damages provisions of Civil Rights Act of 1991 do not apply to pre-enactment conduct, notwithstanding allegations of a continuing violation). The continuing violation theory is generally thought to be reserved for the statute of limitations setting, where plaintiffs recover for discriminatory conduct that was unlawful when committed, albeit outside the limitations period. See generally, Bishop, supra; Voytek, supra. This is different than the situation presented by the case sub judice, where the pre-ADA conduct was lawful when committed.

A closer examination of Landgraf provides further guidance

_____

continuing violation theory to allow recovery for conduct antedating an amendment to Civil Rights Act of 1991); Bodiford v. Alabama, 854 F. Supp. 886, 891 n.3 (M.D. Ala. 1994) (although a portion of alleged unlawful conduct occurred prior to effective date, ADA claim survives because "discriminatory conduct is continuing in nature").

These cases are not controlling, however. Boyle and Bodiford provide little to no analysis on the retroactivity question, and neither contain an express statement that plaintiffs could potentially recover damages for pre-Act violations. Moreover, this court respectfully disagrees with the reasoning employed by the court in Park.

for the case at bar.  Barbara Landgraf originally sought relief under Title VII's equitable remedy provisions for the sexual harassment and retaliation she allegedly experienced while employed at a USFI Film Products plant in Tyler, Texas.  The district court dismissed her complaint.  While her appeal was pending, the President signed into law the Civil Rights Act of 1991, which expanded the remedies available to certain Title VII claimants by creating the right to compensatory and punitive damages, as well as the right to a jury trial.[13]  See Rev. Stat. § 1977A(a), 42 U.S.C. § 1981a(a), as added by § 102 of the 1991 Act, Pub. L. 102-166, 105 Stat. 1071.  On appeal, Landgraf argued that the provisions of the new Act should apply to her suit, although the alleged discriminatory conduct occurred before the Act was passed.

The Court held that the plaintiff sought to apply the Act "retroactively," even though the provision superficially concerned solely plaintiff's remedies and did not otherwise alter the defendants' scope of liability for previous acts.  The Court first held that the punitive damages provision could not apply to prior conduct because it "share[s] key characteristics of criminal sanctions" and that "retroactive imposition of punitive

_____

[13]Formerly, Title VII afforded such plaintiffs only 'equitable' remedies such as back pay.  Landgraf, supra, ___ U.S. at ___, 114 S. Ct. at 1490.

18

damages would raise a serious constitutional question."

Landgraf, supra, ___ U.S. at ___, 114 S. Ct. at 1505.[14]  Although

recognizing that the imposition of compensatory damages for pre-

Act conduct presented a more difficult question, the Court also

held that this provision could not apply to pre-Act conduct.  The

Court reasoned that

> [u]nlike certain other forms of relief, compensatory damages are quintessentially backward-looking.  Compensatory damages may be *intended* less to sanction wrongdoers than to make victims whole, but they do so by a mechanism that affects the liabilities of defendants.  They do not "compensate" by distributing funds from the public coffers, but by requiring particular employers to pay for harms they caused.

Id., ___ U.S. at ___, 114 S. Ct. at 1506.

     If the remedies at issue in Landgraf "affect[] the

liabilities of defendants," so too would applying the continuing

violation theory, which is, at a minimum, a form of remedy.

Holding the defendants accountable for conduct that occurred

prior to the enactment of the ADA would be tantamount to

"imposing new burdens on persons after the fact."  Id., ___ U.S.

at ___, 114 S. Ct. at 1500.  It would also likely substantially

increase the defendants' financial liability.  See id., ___ U.S.

_____

     [14]The court also refused to apply the provision concerning the right to a jury trial where the conduct pre-dated the amendment, noting that the option "must stand or fall with the attached damages provisions."  Id. at 1505.

19

at \_\_\_, 114 S. Ct. at 1507 ("Neither in <u>Bradley</u> itself, nor in any case before or since in which Congress had not clearly spoken, have we read a statute substantially increasing the monetary liability of a private party to apply to conduct occurring before the statute's enactment.") (citation omitted).

This court will not reach back and, post-factum, deem that defendants could be liable for conduct that was lawful when committed, absent a clear directive from Congress.  The court therefore holds that compensating plaintiff for her pre-Act injuries would amount to a "retroactive" application of the ADA, notwithstanding the continuing nature of defendants' conduct.

Accordingly, defendants' motion to dismiss the ADA claim is granted in part (as to the failure to promote) and denied in part (as to the termination).[15]

c.  <u>Individual Liability under the ADA</u>

Defendants argue that the ADA claims against defendants William B. Price and William H. Price should be dismissed "because there is no individual liability under the Americans

---

[15]The court notes that the issue of the relevance of the evidence surrounding the failure to promote has not been raised; thus, the court's ruling does not foreclose the admissibility of such evidence.

with Disabilities Act."  <u>See</u> Motion to Dismiss at 10.

The legal landscape has changed considerably since this court issued <u>Lamirande v. Resolution Trust Corp.</u>, 834 F. Supp. 526, 528 (D.N.H. 1993), in which it stated that there was "general agreement" among the circuits that an "'agent' of an 'employer' is subject to individual liability under Title VII."[16] This understanding derived from the plain language of the statute.  Under Title VII,

> [i]t shall be an unlawful employment practice for an employer--
> (1) to fail or refuse to hire or to discharge any individual, or otherwise to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin;
> . . . .

42 U.S.C. § 2000e-2(a)(1).  Title VII defines "employer" as "'a person engaged in an industry affecting commerce who has fifteen or more employees for each working day in each of twenty or more calendar weeks in the current or preceding calendar year, *and any agent of such a person . . . .*'"  42 U.S.C. § 2000e(b) (emphasis

---

[16]In order to determine whether personal liability would attach here, it is appropriate to examine cases interpreting Title VII, which contains relevant language similar to that within the ADA.  See <u>Carparts Distrib. Ctr. v. Automotive Wholesaler's Ass'n</u>, 37 F.3d 12, 16 (1st Cir. 1994).

21

added).

Now numerous circuits have embraced another interpretation: instead of intending to impose personal liability, Congress included the "agent" wording merely to emphasize that employers are subject to the principles of respondeat superior. See Tomka v. Seiler Corp., 66 F.3d 1295, 1313-17 (2d Cir. 1995); Birkbeck v. Marvel Lighting Corp., 30 F.3d 507, 510 (4th Cir.), cert. denied, ___ U.S. ___, 115 S. Ct. 666 (1994); Grant v. Lone Star Co., 21 F.3d 649, 651-53 (5th Cir.), cert. denied, ___ U.S. ___, 115 S. Ct. 574 (1994); EEOC v. AIC Sec. Investigations, 55 F.3d 1276, 1279-82 (7th Cir. 1995); Greenlaw v. Garrett, 59 F.3d 994, 1001 (9th Cir. 1995) (citing Miller v. Maxwell's Int'l, Inc., 991 F.2d 583, 587-88 (9th Cir. 1993), cert. denied, ___ U.S. ___, 114 S. Ct. 1049 (1994)); Busby v. City of Orlando, 931 F.2d 764, 772 (11th Cir. 1991).

The issue has been the focus of substantial debate, even within circuits recently holding that plaintiffs cannot recover from "agents" in their personal capacities. Our own circuit is no exception. Compare Braverman v. Penobscot Shoe Co., 859 F. Supp. 596, 602-03 (D. Me. 1994) (ADA permits personal liability) and Lamirande, supra, 834 F. Supp. at 527-29 (same) with Quiron v. L.N. Violette Co., Inc., 897 F. Supp. 18, 19 (D. Me. 1995) (no individual liability under ADA).

22

In the absence of precedent on point by the First Circuit Court of Appeals, this court could legitimately follow its earlier holding and find here that an agent who exercises supervisory control can be personally liable under the ADA. However, given the virtual consensus among the circuit courts addressing the issue, the court has been persuaded to change its position. Accordingly, the court grants defendants' motion to dismiss the ADA claim against the individual defendants.

3. Wrongful Discharge

    a. The Public Policy Component

To assert a claim for wrongful discharge under New Hampshire law, plaintiff must allege that (1) her employers were motivated by bad faith, malice, or retaliation; and (2) they discharged her because she performed acts that public policy would encourage or refused to perform acts that public policy would condemn. Wenners v. Great State Beverages, Inc., ___ N.H. ___, ___, 663 A.2d 623, 625 (1995) (citing Short v. Administrative Unit No. 16, 136 N.H. 76, 84, 612 A.2d 364, 370 (1992)); Cloutier v. Great Atlantic & Pacific Tea Co., 121 N.H. 915, 921-22, 436 A.2d 1140, 1143-44 (1981).

Plaintiff asserts she was terminated, in part, because she requested time off from work in order "to accompany her disabled

23

child to speech therapy." See Objection at 18; Complaint ¶ 41. Plaintiff maintains that such a request is encouraged by the public policy articulated in the preamble to the ADA and in the Family and Medical Leave Act, 29 U.S.C. § 2601, et seq. (1988 & Supp. V 1993). Defendants argue that plaintiff's wrongful termination claim should be dismissed because she has failed to state a viable public policy as the alleged "public policy" derives from the same facts underlying plaintiff's Title VII and ADA claims; namely, her status as a mother of a disabled child.[17]

The Supreme Court of New Hampshire has recently stated, "a plaintiff may not pursue a common law remedy where the legislature intended to replace it with a statutory cause of action," Wenners, supra, ___ N.H. at ___, 663 A.2d at 625. Such an intent is indicated when a statute provides a remedy for its violation and sets forth procedures for pursuing such action. Id. Thus in Howard, the common law action was supplanted by a statute which "specifically prohibits age discrimination and details procedure[s] for pursuing such action . . . ." Wenners, supra, ___ N.H. at ___, 662 A.2d at 625.

---

[17]Defendants cite Kopf v. Chloride Power Elecs., Inc., 882 F. Supp. 1183, 1189-90 (D.N.H. 1995), in which this court relied upon Howard v. Dorr Woolen Co., 120 N.H. 295, 297, 414 A.2d 1273, 1274 (1980), to hold that an employee allegedly discharged based on age or disability failed to state he was wrongfully terminated in violation of public policy.

24

Unlike the plaintiffs in _Howard_ and _Kopf_, the instant plaintiff has not stated a claim for which a statute provides a remedy or sets forth procedures for pursuing such action.[18] Her wrongful discharge claim is based solely on defendants' alleged retaliation against her for requesting leave to take care of her disabled son. Title VII would not apply to these facts because plaintiff does not here allege that the retaliation was due to gender discrimination. Neither would the remedies or procedures contained within the ADA be available to plaintiff for a claim based on these facts: since she herself is not disabled, the ADA would not require her employer to reasonably accommodate her request for time off from work. _See_ 29 C.F.R. pt. 1630.8, App. ("It should be noted, however, that an employer need not provide the applicant or employee without a disability with a reasonable accommodation because that duty only applies to qualified

---

[18]Plaintiff's claim is distinguishable from that brought in _Kopf_ for yet another reason. In _Kopf_ (and in _Howard_) the alleged discharge was due to plaintiff's status as a disabled or aged person, and not to any activity he performed or refused to perform. _See Kopf_, _supra_, 882 F. Supp. at 1189-90 & n.6 ("For at least the past fifteen years, New Hampshire courts have indicated that disability or age are not _acts_ that an employee performs or refuses to perform and thus fail to meet the public policy benchmark.") (emphasis added) (citation omitted). The instant plaintiff does not appear to be recasting a claim actually based on her status into the public policy mold. Instead, she has arguably alleged that her discharge was due to the performance of a specific act: requesting leave in order to attend to her disabled child.

applicants or employees with disabilities. Thus, for example, an employee would not be entitled to a modified work schedule as an accommodation to enable the employee to care for a spouse with a disability."). Therefore, as federal remedies and procedures are not available for the particular facts underlying plaintiff's wrongful discharge claim, the federal statutes would not supplant her common law claim.

Having found that plaintiff's wrongful discharge claim is not barred by a federal statute, the court now turns to whether plaintiff has stated a viable public policy. The public policy may be defined by statutory or nonstatutory policy. Cilley v. N.H. Ball Bearings, Inc., 128 N.H. 401, 406, 514 A.2d 818, 821 (1986). At the time of the alleged conduct of defendants, Congress had not yet passed the Family and Medical Leave Act (FMLA), 29 U.S.C. § 2601(b)(2) (Supp. 1995), which provides in pertinent part:

> **(b) Purposes**
> It is the purpose of this Act--
>     . . . .
>     (2) to entitle employees to take
> reasonable leave for medical reasons,
> for the birth or adoption of a child, and
> for the care of a child, spouse, or
> parent who has a serious health condition
>     . . . .

26

Nonetheless, a reasonable juror[19] could conclude that at that time in New Hampshire a nonstatutory public policy existed that would protect employees seeking leave to take care of their disabled children. As a jury would be the most appropriate entity to decide whether a public policy exists here, the court denies defendants' motion to dismiss the wrongful discharge claim for failure to state a viable public policy.

### b. Individual Defendants

Defendants next argue that the wrongful discharge claims against defendants William B. Price and William H. Price must be dismissed because they, as individuals, did not enter into an employment relationship with plaintiff.

Plaintiff contends that as the claim for wrongful discharge sounds in tort, not in contract, her case does not depend on whether an employment relationship existed with the individual defendants.[20] Plaintiff is not persuasive. Obviously, the

---

[19]Except in very clear situations, the existence of a public policy should generally be decided by the trier of fact. Short, supra, 136 N.H. at 84, 612 A.2d at 370; Cloutier, supra, 121 N.H. at 924, 436 A.2d at 1145. This is because such a determination calls for "the type of multifaceted balancing process that is properly left to the jury in most instances." Id.

[20]The court is not persuaded by plaintiff's citation to Chamberlin v. 101 Realty, Inc., 626 F. Supp. 865 (D.N.H. 1985), in which plaintiff asserted a wrongful discharge claim against the president of a company in his individual capacity. The court

27

existence of an employment relationship is fundamental to a claim for wrongful discharge.  See Bourque v. Town of Bow, 736 F. Supp. 398, 401 (D.N.H. 1990) (citing Vandegrift v. American Brands Corp., 572 F. Supp. 496, 499 (D.N.H. 1983)).  Thus, even assuming a wrongful discharge claim gives rise to a tort action, see Hutton v. Essex Group, Inc., 885 F. Supp. 331, 332 (D.N.H. 1994), the court would not be inclined to discard the essential requirement that an employment relationship exist between the parties.

Plaintiff does not allege she was employed by the individual defendants.  As such, these defendants cannot be held liable for wrongful discharge.[21]  See Bourque, supra, 736 F. Supp. at 401 (granting summary judgment on wrongful discharge claim given absence of evidence of employment relationship with individual defendants).  Accordingly, defendants' motion to dismiss the wrongful discharge claims against individual defendants is granted.

_____

in Chamberlin did not address whether the president could be personally liable to the plaintiff.

[21]Neither is the court persuaded by plaintiff's characterization of the individual defendants as "aiders or abettors" of the wrongful discharge.

4. Intentional Infliction of Emotional Distress

a. Individual Defendants

To state a claim for intentional infliction of emotional distress, plaintiff must allege that through extreme and outrageous conduct defendants intentionally or recklessly caused severe emotional distress. See Morancy v. Morancy, 134 N.H. 493, 495-96, 593 A.2d 1158, 1159 (1991) (citing RESTATEMENT (SECOND) OF TORTS § 46 (1965)). Liability should be imposed

> only where the conduct has been so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious, and utterly intolerable in a civilized community. Generally, the case is one in which the recitation of the facts to an average member of the community would arouse his resentment against the actor, and lead him to exclaim, "Outrageous!"
> The liability clearly does not extend to mere insults, indignities, threats, annoyances, petty oppressions, or other trivialities.

RESTATEMENT (SECOND) OF TORTS § 46, comment d.

It is for the court, not the jury, to initially determine whether defendants' conduct could be construed as "so extreme and outrageous as to permit recovery." RESTATEMENT (SECOND) OF TORTS § 46, comment h. The court notes that successful claims for intentional infliction of emotional distress typically arise from conduct that was unusually atrocious or outlandish. Compare Wagenmann v. Adams, 829 F.2d 196, 214 (1st Cir. 1987) (arresting

29

and imprisoning and then committing innocent man to mental institution on eve of daughter's wedding constitutes outrageous conduct) (interpreting Massachusetts law) with Daemi v. Church's Fried Chicken, Inc., 931 F.2d 1379, 1387-88 (10th Cir. 1991) (employer's conduct, which included calling employee names based on employee' national origin, rudeness, mistreatment at seminars, and compelling employee to terminate subordinates because of their national origin did not rise to level of outrageous conduct) (interpreting Oklahoma law).

After careful review of plaintiff's allegations in their entirety, the court finds that plaintiff has just barely satisfied her burden at this juncture. Extending Miller every possible inference in her favor, Miller's claim for emotional distress arises from what can be described as a series of disturbing verbal commentaries and personal attacks levied by defendants, who wielded professional power over her. Plaintiff alleges defendants William B. Price and William H. Price continually questioned her abilities and expressed stereotypical attitudes on the issue of whether women should stay at home to take care of their children.

For example, defendants regularly told Miller that her chances for promotion were limited because of what they presumed to be her family obligations. Complaint ¶ 40. Plaintiff alleges

30

defendants repeatedly asked her, following the birth of one of her children, "Are you coming back?; Are you sure you don't want to stay home?; Can we count on you?" See Complaint ¶ 20. Assuming defendants' alleged discriminatory comments were made regularly and persistently, they may go beyond the "mere insults, indignities, threats, annoyances, or other trivialities" which an employee can be expected to endure. They may also indicate the "abuse by the defendant of some relation or position which gives him actual or apparent power to damage the plaintiff's interests." W. Page Keeton, et al., Prosser and Keeton on Torts § 12, at 61 (5th ed. 1984). Therefore, the court denies defendants' motion to dismiss plaintiff's claim for intentional infliction of emotional distress. However, the court grants defendants' motion to dismiss plaintiff's claim for reckless infliction of emotional distress.[22]

### b. Corporate Defendants

Defendants argue that the claims for emotional distress against corporate defendants CBC and CBS are barred by the

---

[22]Plaintiff's claim for reckless infliction of emotional distress fails because New Hampshire does not recognize a separate tort for reckless infliction of emotional distress. Instead, the tort of intentional infliction of emotional distress can be satisfied by either intentional or reckless conduct. See Morancy, supra, 134 N.H. at 495-96, 593 A.2d at 1159.

exclusivity clause of the New Hampshire Workers' Compensation Law.

The "exclusivity" provision provides, in pertinent part:

> **281:12 Employees Presumed to have Accepted.**
> An employee of an employer subject to this chapter shall be conclusively presumed to have accepted the provisions hereof and on behalf of himself, or his personal or legal representatives, to have waived all rights of action whether at common law or by statute or otherwise:
> I.  Against the employer or the employer's insurance carrier; and
> II.  Except for intentional torts, against any officer, director, agency, servant or employee acting on behalf of the employer or the employer's insurance carrier.

RSA 281:12 (1987).[23]  RSA 281:12 "clearly prohibits an employee from maintaining a common-law action against his employer for personal injuries arising out of the employment relationship." O'Keefe v. Associated Grocers of New England, Inc., 120 N.H. 834, 835-36, 424 A.2d 199, 201 (1980).  For the purposes of this provision, emotional distress qualifies as a "personal injury". Censullo v. Brenka Video, 989 F.2d 40, 43 (1st Cir. 1993) (interpreting New Hampshire law).  The statute likewise makes plain that the prohibition extends to both intentional and nonintentional torts.  As such, it is clear that the statute

_____

[23]This provision has been modified by RSA 281-A:8 (Supp. 1994), but not in any respect material to this action.

precludes an employee from pursuing a claim for intentional infliction of emotional distress against his or her employer. See id. Accordingly, the court grants the corporate defendants' motion to dismiss the claim for intentional infliction of emotional distress.

## 6. Michael B. Miller's Claim for Loss of Consortium

Defendants next move to dismiss plaintiff Michael B. Miller's claim for loss of consortium, deriving from Miller's Title VII claims and ADA claims, as well as from her common law claims for wrongful discharge and intentional infliction of emotional distress.

The court grants defendants' motion to dismiss the consortium claims to the extent they derive from plaintiff's ADA and Title VII claims. The court has previously noted that "[t]he spouse of an alleged federal civil rights victim is not permitted an ancillary cause of action for loss of consortium." Vargus v. Donut, No. 92-301-SD, slip op. at 2 (D.N.H. Apr. 4, 1994) (citing Tauriac v. Polaroid Corp., 716 F. Supp. 672, 673 (D. Mass. 1989)). As nothing in the ADA language indicates otherwise, this court finds that an ADA claim, in addition to a Title VII claim, cannot support an ancillary claim for loss of consortium.

The court next addresses the consortium claim insofar as it derives from Susan Miller's claim for wrongful discharge. Defendants argue that as a claim for wrongful discharge sounds in

33

contract, Michael Miller cannot receive loss of consortium damages, which are only recoverable in conjunction with a spouse's tort claim.

New Hampshire permits a husband or wife to recover loss of consortium damages "whether caused intentionally or by negligent interference."  New Hampshire Revised Statutes Annotated (RSA) 507:8-a.  However, the determination of "[w]hether an action is 'on a contract or in tort is not controlled by the form of the action but by its substance.'"  Young v. Abalene Pest Control Servs., Inc., 122 N.H. 287, 289, 444 A.2d 514, 515 (1982) (citation omitted).  Therefore, the court must determine whether the duty allegedly violated in a wrongful discharge action asserted by an at-will employee arises from a contractual or tortious obligation.

The court has held in other settings that under New Hampshire law a claim for wrongful discharge should be treated as a tort claim.  See, e.g., Frechette v. Wal-Mart Stores, Inc., No. 94-430-JD, slip op. at 3-4 (D.N.H. Sept. 26, 1995) (wrongful discharge claim is a tort claim, for which no separate contractual remedy is available) (interpreting New Hampshire law).  Indeed, the court has also previously found that tort remedies such as front-pay are available to an at-will employee alleging wrongful termination.  See Hutton v. Essex Group, Inc., 885 F. Supp. 332, 332 (D.N.H. 1994) (discussing treatment by New Hampshire Supreme Court).  In light of this precedent, the court

34

sees no reason to preclude plaintiff Michael Miller from pursuing a tort remedy for his loss of consortium, assuming Susan Miller prevails on her claim for wrongful termination.[24]

Finally, the court turns to whether Michael Miller's claim for loss of consortium can be predicated on a claim for intentional infliction of emotional distress. The individual defendants argue that the loss of consortium claim is not viable against them because plaintiff has failed to allege a physical injury. New Hampshire requires that one spouse suffer a physical injury in order for the other spouse to recover loss of consortium damages. See Hardiman v. United States, 752 F. Supp. 52, 54 (D.N.H. 1989) (citing LaBonte v. National Gypsum Co., 110 N.H. 314, 319, 269 A.2d 634, 638 (1970)). As at least one commentator has noted, there can be no recovery of such damages "in the absence of a basis for inferring that services or affection were actually lost." PROSSER AND KEETON ON TORTS, supra, §

---

[24]Defendants ask that this court follow the reasoning of Young and deny plaintiff's claim; however, the circumstances of that case are distinguishable from the case at bar. In Young, the plaintiff's claims, although styled as arising in tort, were actually based on the defendant's breach of a contractual provision. The parties entered into a contract under which the defendant would inspect a home that plaintiffs, a married couple, hoped to purchase; the parties also contracted that defendant would certify whether the house was free of insects. In reliance on the defendant's certification, the plaintiffs bought the property, only to discover that it was infested with wood-destroying carpenter ants. Young, supra, 122 N.H. at 288, 444 A.2d at 515. The court determined that the defendant's underlying duty, to properly certify whether the house was free from insects, arose directly from a provision of the contract.

125, at 933.  Here, plaintiff has alleged she suffered "severe emotional distress and physical illness."  <u>See</u> Complaint ¶ 53.  Accordingly, the court finds she has sufficiently provided a basis for inferring that "services or affection were actually lost."  However, regarding the claim against the corporate defendants, Michael Miller's recovery of loss of consortium damages is plainly barred by the Worker's Compensation Act, which also precluded Susan Miller's claim.[25]

Accordingly, the court grants defendants' motion to dismiss Michael Miller's claim for loss of consortium insofar as it derives from plaintiff's Title VII and ADA claims; grants the corporate defendants' motion to dismiss the claim to the extent it derives from intentional infliction of emotional distress; and grants the individual defendants' motion to dismiss the claim insofar as it is predicated on plaintiff's wrongful discharge.  Otherwise, as to the remaining components of Michael Miller's claim, defendants' motion is denied.

---

[25]RSA 281-A:8 (II) states:

> The spouse of an employee entitled to benefits under this chapter, or any other person who might otherwise be entitled to recover damages on account of the employee's personal injury or death, shall have no direct action, either at common law or by statute or otherwise, to recover for such damages against any person identified in subparagraph I(a) or (b).

36

## Conclusion

For the foregoing reasons, defendants' motion to dismiss (document 7) is granted as to (1) plaintiff's ADA claim (Count II) to the extent it is based on acts occurring prior to July 26, 1992; (2) plaintiff's wrongful discharge claim (Count III) against defendants William H. Price and William B. Price; (3) plaintiff's intentional infliction of emotional distress claim (Count IV) against defendants CBC and CBS; (4) plaintiff's reckless infliction of emotional distress claim (Count V); and (5) Michael B. Miller's claim for loss of consortium (Count VI) insofar as it is predicated on plaintiff's Title VII and ADA claims, plaintiff's claim for intentional infliction of emotional distress against CBC and CBS, and plaintiff's claim for wrongful discharge against William B. Price and William H. Price. Otherwise, as to all other claims, defendants' motion is denied.

SO ORDERED.

_____
Shane Devine, Senior Judge
United States District Court

November 29, 1995

cc:  John M. Lewis, Esq.
     Debra Dyleski-Jajjar, Esq.