**ALABAMA POWER COMPANY,**
et al., Petitioners,

v.

**FEDERAL ENERGY REGULATORY COMMISSION, Respondent.**

No. 97–1725.

United States Court of Appeals,
District of Columbia Circuit.

Argued Oct. 9, 1998.

Decided Nov. 13, 1998.

Dan H. McCrary argued the cause for petitioners. With him on the briefs were Rodney O. Mundy, Lyle D. Larson and Andrew W. Tunnell.

Larry D. Gasteiger, Attorney, Federal Energy Regulatory Commission, argued the cause for respondent. With him on the brief were Jay L. Witkin, Solicitor, and Susan J. Court, Special Counsel.

Edward H. Comer and Henri D. Bartholomot were on the brief for amicus curiae Edison Electric Institute. William L. Fang entered an appearance.

Before: SILBERMAN, ROGERS and GARLAND, Circuit Judges.

# 8

SILBERMAN, Circuit Judge:

Under the Federal Power Act, federally regulated electric utilities must obtain FERC's approval before changing the rates they charge to wholesale and retail consumers. This case presents the question whether a different provision of the Act requires utilities to obtain similar "pre-approval" before modifying the depreciation rates they use for accounting purposes. Petitioners contended unsuccessfully before the Commission that the statutory provision does not impose such an obligation. We agree with petitioners that the Commission unreasonably read the statute, and accordingly we vacate the orders under review.

## I.

Electric utilities incur expenses in producing power, but regulators do not permit every sort of expense to be recovered immediately—nor should they. It would make no sense to allow a utility that constructs a power plant for $100 million to set rates high enough to recover that expense over the course of one year. Although the plant will deteriorate from use from year to year, the plant might last for 20 years or more, and its cost should be recovered over the course of that useful life.

Depreciation charges are the means by which a utility recovers over time the capital invested in the facilities or plant used in producing power. Because a higher depreciation charge implies that the utility should be permitted a higher rate (and conversely a lower depreciation charge implies that the utility should be allowed a lower rate),[1] one would expect both the Commission and the utilities it regulates to have a keen interest in the accurate measurement of depreciation. It is not surprising, then, that as a by-product of its authority under §§ 205 and 206 of the Federal Power Act (FPA) (codified as amended at 16 U.S.C. §§ 824d, 824e (1994)) to regulate the rates utilities can charge to consumers, the Commission has regulated depreciation accounting by utilities. *See, e.g., Cities of Aitkin v. FERC,* 704 F.2d 1254, 1255–56 (D.C.Cir.1982) (rejecting challenge to FERC order granting a utility's proposed rate increase in part because the utility had adequately justified increasing the rate of depreciation claimed for steam and hydraulic generating equipment); *South Carolina Elec. & Gas Co.,* 76 F.E.R.C. ¶ 61,338 (1996) (rejecting proposed rate change because the utility had improperly shifted depreciation reserves from one asset to another).

Where depreciation accounting is not implicated in a ratemaking proceeding, however, it appears that the Commission has not attempted to regulate it. That is not to say that the Commission lacks the statutory authority to do so. Apart from its duties regarding the rates utilities may charge for their service, the Commission has been delegated authority over accounting procedures *per se.* Section 301 of the Act addresses record keeping generally, requiring utilities to keep "such accounts ... as the Commission may by rules and regulations prescribe as necessary or appropriate for the purposes of the administration of this chapter" and authorizing the Commission to inspect such accounts at all times. 16 U.S.C. § 825(a)-(b) (1994). Pursuant to this authority, the Commission adopted in 1960 the Uniform System of Accounts, 18 C.F.R. pt. 101 (1998), a comprehensive classification and enumeration of revenue and expense items that utilities must use in keeping their books. Yet although the Uniform System of Accounts defines "depreciation," 18 C.F.R. pt. 101, Definition 12, and sets forth the components of the depreciation account, *id.* at Item 108, nowhere does it prescribe a depreciation method or fix depreciation rates. *See* OFFICE OF CHIEF ACCOUNTANT, FEDERAL ENERGY REGULATORY COMMISSION, ELECTRIC UTILITY DEPRECIATION PRACTICES, 1976, at 1 (1980) ("The Uniform System of Accounts requires depreciation accounting but prescribes no particular depreciation method.").

---

1. Cost of service ratemaking can be described in mathematical terms: $R = O + (V-d)r$, where R is the utility's total revenue requirements; O is its operating costs, including all types of operating and maintenance expenses, depreciation expense, and taxes; V is the original cost or value of its investments in facilities; d is accumulated depreciation; and r is the reasonable rate of return. *See* CHARLES F. PHILLIPS, JR., THE REGULATION OF PUBLIC UTILITIES 177 (3d ed.1993).

Section 302, unlike section 301, reflects a specific focus on depreciation and depreciation rates. 16 U.S.C. § 825a (1994). Section 302(a) grants the Commission the authority, "after hearing," to prescribe "rules, regulations, and forms of account" to govern the depreciation accounting of regulated utilities. *Id.* at § 825a(a). The Commission is also authorized to "ascertain and determine, and by order fix, the proper and adequate rates of depreciation of the several classes of property of each licensee and public utility." *Id.* Section 302(b) obliges the Commission to notify State commissions having jurisdiction with respect to any public utility involved "before prescribing any rules or requirements as to accounts, records, or memoranda, or as to depreciation rates." *Id.* at § 825a(b). Yet while § 302 would seem to authorize the Commission to promulgate rules and regulations governing depreciation accounting, it has lain dormant in the United States Code since Congress added it to the FPA in the Public Utility Act of 1935, ch. 687, Title II, sec. 213, § 302, 49 Stat. 803, 855 (1935).

Section 302's dormancy ended in 1994, however, when the Commission, responding to Midwest Power's unsolicited letter informing the Commission of its intention to change its depreciation rates, declared that it was "inappropriate for [Midwest Power] to reduce its depreciation rates for accounting purposes without a corresponding change in the depreciation rates embedded in its wholesale and retail electric rates." *Midwest Power Sys. Inc.*, 67 F.E.R.C. ¶ 61,076, at 61,207 (April 19, 1994) (quoting 1994 Letter Order from FERC's Chief Accountant) (internal quotation marks omitted) (alteration in original).[2] The Commission reasoned that the plain language of § 302—especially the part of § 302(a) providing that public utilities shall not charge "with respect to any class of property a percentage of depreciation *other than that prescribed therefor by the Commission*," 16 U.S.C. § 825a(a) (emphasis added)—implies that a utility may not unilaterally choose its depreciation rates, for rates so chosen would not be "prescribed by the Commission." *Midwest Power*, 67 F.E.R.C. at 61,208, 61,209. The Commission concluded that utilities must henceforth seek prior approval from the Commission before changing their depreciation rates. *See id.* at 61,209–10.

When Midwest Power obeyed this order and filed a request for authorization to reduce its annual composite depreciation rate, the Commission dismissed the request as moot—changes made before April 19, 1994 (the date of FERC's *Midwest Power* order) were retroactively accepted if based on sound accounting practices—but did not offer further justification for the new pre-approval system. *MidAmerican Energy Co.*, 79 F.E.R.C. ¶ 61,169, at 61,794 (May 15, 1997).[3] Because Midwest Power's request for a rate change was granted, it did not seek rehearing of the May 1997 order. But Southern Company Services, Inc., acting as agent for its subsidiary companies including Alabama Power Company, was granted permission to intervene and requested rehearing. *MidAmerican Energy Co.*, 81 F.E.R.C. ¶ 61,081 (October 22, 1997). Southern argued that § 302 is an enabling statute that is not self-executing, and therefore does not require public utilities to seek pre-approval from the Commission but only to conform to rates that the Commission has already fixed. *Id.* at 61,326. Southern also asserted that the May

---

**2.** We are uncertain as to FERC's policy reasons for invoking § 302 now for the first time since its enactment. The Commission's counsel surmised at oral argument that it had something to do with the problem of stranded investment costs that has arisen from the recent movement toward giving competitors open-access to power grids. *See Cajun Elec. Power Coop. v. FERC*, 28 F.3d 173, 175–77 (D.C.Cir.1994) (describing the stranded costs problem).

**3.** Although the Commission thought the statutory language clear, it decided against retroactive enforcement of its *Midwest Power* order because of "*confusion* in the industry as to the appropriate filing requirements." *MidAmerican Energy Co.*, 79 F.E.R.C. at 61,793 (emphasis added). For rate changes made between April 19, 1994 and May 22, 1997 (the date the May 15, 1997 order was published in the Federal Register), the Commission adopted an amnesty policy under which a utility was obliged to file for retroactive approval before December 31, 1997. *Id.* For rate changes made after May 22, 1997, the Commission would require prior approval before allowing any change. *Id.* at 61,793 n. 2.

1997 order was procedurally invalid because the Commission had neither given notice to the State commissions as § 302(b) requires nor followed the notice and comment procedure of 5 U.S.C. § 553 (1994) in promulgating what Southern claimed was a substantive rule. *Id.* at 61,327.

The Commission rejected Southern's arguments and denied the request for rehearing. Pointing to the same language in § 302(a) that it had emphasized in its April 1994 order, the Commission concluded that § 302 is not merely an enabling provision, but rather expressly imposes a pre-approval requirement. *Id.* at 61,328. The Commission responded to Southern's APA objection by characterizing the May 1997 order as an "interpretative" rule exempt from the APA's notice and comment procedures; in the Commission's view, the May 1997 order "did little more than reiterate the statutory obligation imposed on public utilities and licensees by Congress in 1935." *Id.* As for Southern's claim that the Commission violated § 302(b) by not providing notice to the State commissions prior to issuing the May 1997 order, the Commission maintained that it did send the May 1997 order to the State commissions after issuance and that no State commission had responded or indicated any objection to the order. *Id.* at 61,327 n. 11. Southern and the other intervenors before the Commission now petition us for review of the May 1997 and October 1997 orders.

## II.

■ Before deciding whether § 302(a) requires utilities to gain the Commission's approval before changing their depreciation rates for accounting purposes, we see an initial weakness in the Commission's position: its apparent failure to comply with § 302(b). Section 302(b) provides:

> The Commission, *before* prescribing any rules or requirements as to accounts, records, or memoranda, or as to depreciation rates, shall notify each State commission having jurisdiction with respect

to any public utility involved, and shall give reasonable opportunity to each such commission to present its views, and shall receive and consider such views and recommendations.

16 U.S.C. § 825a(b) (emphasis added). Petitioners argue that the Commission neglected to provide the requisite notice to the State commissions before issuing its May 1997 order, and that the May 1997 order and the October 1997 order justifying the May 1997 order are therefore invalid. The Commission responds that it complied with § 302(b) by publishing the May 1997 order in the Federal Register *after* it was issued, *see* 62 Fed.Reg. 28,015 (May 22, 1997), and by sending the *May 1997 order* to the State commissions *before* issuing the October 1997 order.

We think it obvious that the Commission did not comply with § 302(b). The Commission identified its May 1997 order as a "rule" in its October 1997 order, in its brief, and at oral argument. *See, e.g., MidAmerican Energy Co.,* ¶ 61,081, at 61,328 (emphasis added) ("[W]e believe that the May 15 order properly may be characterized as an 'interpretative *rule.*'"). In doing so, the Commission has hoisted itself on its own petard, for § 302(b) requires the Commission to notify the State commissions "before prescribing any *rules.*" 16 U.S.C. § 825(a)(b) (emphasis added). Publishing the May 1997 order in the Federal Register and notifying the State commissions *after* issuing the May 1997 order do not satisfy that requirement. The Commission's neglect of § 302(b) suffices for us to hold the May 1997 and October 1997 orders invalid.

Alternatively, the Commission contends, rather obliquely, that any failure to comply with § 302(b) was harmless in light of the absence of response or objection from a single State commission since the State commissions received notice—albeit tardy—of the May 1997 order. We say "oblique" because the Commission neither cited the APA's harmless error rule nor explained why a State commission's failure to object after receiving a belated notice necessarily implies that no harm was done.[4] In any event, we

---

**4.** The APA provides that "[t]he reviewing court shall ... hold unlawful and set aside agency action ... found to be ... without observance of procedure required by law," 5 U.S.C. § 706(2)(D) (1994), and that "[in] making the foregoing determination[], ... due account shall

think it impossible to conclude that no State commission would have had objections, or at least comments, if they had been presented with a proposal rather than a *fait accompli.*

Finally, we should note that the Commission's characterization of its May 1997 order as an *"interpretative* rule"[5] for purposes of the APA's notice and comment requirement—assuming the characterization were correct—would not release the Commission from its obligations under the organic statute, § 302(b), which draws no distinction between interpretative rules and other sorts of rules. *See* 5 U.S.C. §§ 553(b), (b)(A) (emphasis added) (*"Except when notice or hearing is required by statute,* this subsection does not apply ... to interpretative rules."); *Union of Concerned Scientists v. Nuclear Regulatory Comm'n,* 711 F.2d 370, 380–81 (D.C.Cir.1983) (holding that 5 U.S.C. § 553(b)(B)'s "good cause" exemption from notice and comment requirements does not dispense with procedural requirements imposed by the organic statute).

### III.

■ Although we could rest on our determination that the Commission's May 1997 order violates § 302(b), we think it appropriate to consider alternatively petitioners' more substantive argument—that the order is simply not authorized under § 302(a). Petitioners and the Commission, not atypically, both claim that the plain language of the section supports their respective readings and therefore ends our analysis. *See Chevron U.S.A. Inc. v. Natural Resources Defense Council, Inc.,* 467 U.S. 837, 842–43, 104 S.Ct. 2778, 81 L.Ed.2d 694 (1984). We set out § 302(a) in full:

The Commission may, after hearing, require licensees and public utilities to carry a proper and adequate depreciation account in accordance with such rules, regulations, and forms of account as the Commission may prescribe. The Commission may, from time to time, ascertain and determine, and by order fix, the proper and adequate rates of depreciation of the several classes of property of each licensee and public utility. Each licensee and public utility shall conform its depreciation accounts to the rates so ascertained, determined, and fixed. The licensees and public utilities subject to the jurisdiction of the Commission shall not charge to operating expenses any depreciation charges on classes of property other than those prescribed by the Commission, or charge with respect to any class of property a percentage of depreciation other than that prescribed therefor by the Commission. No such licensee or public utility shall in any case include in any form under its operating or other expenses any depreciation or other charge or expenditure included elsewhere as a depreciation charge or otherwise under its operating or other expenses. Nothing in this section shall limit the power of a State commission to determine in the exercise of its jurisdiction, with respect to any public utility, the percentage rate of depreciation to be allowed, as to any class of property of such public utility, or the composite depreciation rate, for the purpose of determining rates or charges.

16 U.S.C. § 825a(a).

As it did in its October 1997 order, the Commission emphasizes the portion of

---

be taken of the rule of prejudicial error," *id.* at § 706.

5. While petitioners do not challenge the orders on this ground, the Commission's characterization of its May 1997 order as a rule is troubling as a matter of administrative law. The APA establishes a distinction between rulemaking (the agency process for "formulating, amending, or repealing a rule," 5 U.S.C. § 551(5) (1994)) and adjudication (the "agency process for the formulation of an order," *id.* at § 551(7)). The APA does not contemplate the use of adjudication to develop rules. *See* 5 U.S.C. § 551(6) (emphasis added) (defining "order" as "the whole or a part

of a final disposition of an agency *in a matter other than rule making"*) (emphasis added); *see also* H.R.Rep. No. 1980, 79th Cong., 2d Sess., at 20 (1946) ("[T]he term 'order' is essentially and necessarily defined to exclude rules."); *NLRB v. Wyman–Gordon Co.,* 394 U.S. 759, 780, 89 S.Ct. 1426, 22 L.Ed.2d 709 (1969) (Harlan, J., dissenting); *Bowen v. Georgetown Univ. Hosp.,* 488 U.S. 204, 218–19, 109 S.Ct. 468, 102 L.Ed.2d 493 (1988) (Scalia, J., concurring). Although FERC, like other agencies, often engages in the practice of labeling an APA "rule" an "Order," here the Commission was clearly involved in an adjudication of Midwest Power's accounting practices.

§ 302(a) that states that "utilities . . . shall not charge to operating expenses any depreciation charges on classes of property *other than those prescribed by the Commission*, or charge with respect to any class of property a percentage of depreciation *other than that prescribed therefor by the Commission.*" *Id.* (emphasis added). The Commission asserts that this language "unambiguously requires public utilities to employ as depreciation charges and rates only those charges and rates that have been *prescribed* by the Commission," and therefore that "common sense dictates that the changes in depreciation rates must also be approved by the Commission *before* they are used." Petitioners disagree, contending that the Commission has opportunistically focused on selected portions of the provision. Petitioners claim that a reading of the provision as a whole—especially the repeated use of the word "may" rather than "shall"—indicates that § 302 is merely an enabling provision that grants the Commission authority to regulate depreciation accounts; in other words, § 302(a) does not itself impose any obligation but merely lays the groundwork for the Commission to do so.

Although the language of § 302(a) is not pellucid in all respects, we agree with petitioners that it is clear on the discrete issue presented in this case—whether § 302(a) is a self-executing statute or merely an enabling statute. A careful reading reveals that Congress did not establish any self-executing requirements for utilities to follow. Rather, Congress intended to grant *the Commission* the authority to regulate depreciation accounting by utilities.

We think the Commission's paraphrase of the section that a utility may only use depreciation rates *prescribed* by the Commission may be misleading. The structure of the section seems to speak in terms of *prescribing* general rules and *fixing* the rates of individual utilities. The first sentence of § 302(a) authorizes the Commission, after holding a hearing, to "require . . . public utilities to carry a proper and adequate de-

preciation account in accordance with such rules, regulations, and forms of account as the Commission *may* prescribe." 16 U.S.C. § 825a(a) (emphasis added). Here Congress spoke in permissive terms—using "may" rather than "shall"—and established the procedural prerequisite of a "hearing," thereby contemplating that positive action by the Commission, rather than the language of § 302 itself, would underlie the actual regulation of utilities' depreciation accounting. Although we need not decide the issue, it appears that Congress here contemplated a general rulemaking authority for the Commission. The verb "prescribe"—meaning "to lay down . . . [a] rule," WEBSTER'S NEW INTERNATIONAL DICTIONARY 1954 (2d ed.1934)— as well as the words "rules" and "regulations" illustrate that Congress intended to authorize the Commission to promulgate rules and requirements generally applicable to all utilities. For example, the Commission might promulgate a rule that utilities must follow generally accepted accounting principles, or the Commission might set a rate of depreciation (for a class of property) applicable to all utilities.

The second sentence of § 302(a) provides that "[t]he Commission *may, from time to time,* ascertain and determine, and by *order* fix, the proper and adequate *rates* of depreciation of the several classes of property of *each* licensee and public utility." 16 U.S.C. § 825a(a) (emphasis added). Like the first sentence, it is phrased to enable the Commission to regulate rather than to impose self-executing requirements. Although, again, we do not say definitively, Congress here seems to have contemplated a more specific type of regulation: case-by-case, utility-by-utility adjudication of *rates* of depreciation as opposed to generally applicable rules governing accounting practices or generally applicable rates. This is suggested by Congress' use of the verb "fix"—meaning "to assign precisely," WEBSTER'S NEW INTERNATIONAL DICTIONARY 958 (2d ed.1934)—rather than "prescribe," and the words "order" and "*each* licensee and public utility."[6]

---

**6.** Thus, FERC's authority under the first sentence of § 302(a) is general (and analogous to rulemaking under the subsequently enacted APA), and

under the second sentence is specific (and analogous to adjudication under the subsequently enacted APA). The APA, enacted in 1946, Pub.L.

The third sentence explains the relationship between the first and the second sentences, stating that "[e]ach licensee and public utility shall conform its depreciation accounts to the rates so ascertained, determined, and fixed." 16 U.S.C. § 825a(a). In other words, where the Commission has specified general rules of depreciation accounting *and* has fixed an individual utility's rates of depreciation in an adjudication, that utility must employ the fixed rates in complying with the more general accounting rules. Notably, as with the first two sentences, the third sentence reflects Congress' understanding that the Commission, not § 302 itself, would carry out the fixing of rates. Only *after* the Commission had "ascertained, determined, and fixed" a utility's depreciation rates—an obvious reference to the adjudication procedure described in the second sentence—would that utility face any legal obligation.

Nor does the fourth sentence—on which the Commission stakes its argument—support the notion that § 302 itself establishes a pre-approval requirement. It provides that "[t]he licensees and public utilities subject to the jurisdiction of the Commission shall not charge to operating expenses any depreciation charges on classes of property other than those prescribed by the Commission, or charge with respect to any class of property a percentage of depreciation other than that prescribed therefor by the Commission." 16 U.S.C. § 825a(a).[7] The Commission infers from the words "depreciation charges on classes of property *other than those prescribed by the Commission*" and "a percentage of depreciation *other than that prescribed therefor by the Commission*" that changes in depreciation rates must be approved by the Commission before they are used, for otherwise, utilities would be using rates established not by the Commission but by the utilities themselves. We think the Commission takes this sentence out of context. Read in light of the preceding sentences, it seems clear to us that Congress, by using the past tense of the verb "prescribe," was referring back to the first sentence, which concerns the Commission's basic authority to "prescribe" generally applicable rules and generally applicable rates. Thus, *if* the Commission adheres to the procedural requirements of the first sentence and prescribes which classes of property are subject to depreciation, utilities may not *thereafter* take depreciation charges from other classes of property. Similarly, *if* the Commission follows the procedural requirements of the first sentence and generally prescribes a "percentage" (*i.e.,* a rate) of depreciation with respect to a class of property, utilities may not *thereafter* employ a different rate with respect to that class of property. In short, the fourth sentence lacks bite until the Commission regulates by the rulemaking procedure authorized by the first sentence.

In any event, whether or not the section mandatorily divides Commission regulation into discrete rulemaking and adjudication spheres, we think petitioners are correct that it is not self-executing. Even if the term "prescribe" in the fourth sentence could be read as applying to the Commission's setting of an individual utility's depreciation rates, that sentence clearly calls for the Commission to take some action with respect to rates of depreciation before a utility is under an obligation not to alter those rates.

Another provision of the statute supports our reading of § 302. When Congress amended the FPA in the Public Utility Act of 1935, it added not only § 302, but several other provisions, among which was § 205(d). Public Utility Act of 1935, ch. 687, Title II, sec. 213, § 205(d), 49 Stat. 803, 851–52 (1935) (codified at 16 U.S.C. § 824d(d)). Section 205(d), part of a provision dealing with the

---

No. 79–404, 60 Stat. 237 (1946), postdates FPA § 302, which was added to the FPA by the Public Utility Act of 1935. Nonetheless, the analogy to the APA's definitions of rulemaking and adjudication is appropriate because the difference between rulemaking and adjudication was recognized in pre-APA law. *Compare Bi–Metallic Co. v. State Bd. of Equalization,* 239 U.S. 441, 445, 36 S.Ct. 141, 60 L.Ed. 372 (1915) (rulemaking), *with Londoner v. City & County of Denver,* 210 U.S. 373, 385, 28 S.Ct. 708, 52 L.Ed. 1103 (1908) (adjudication).

7. The annual "depreciation charge" for an asset is the value of the asset multiplied by the depreciation rate applicable to that asset. *See* PHILLIPS, THE REGULATION OF PUBLIC UTILITIES at 271.

regulation of rates "made ... in connection with the transmission or sale of electric energy," 16 U.S.C. § 824d(a), provides:

Unless the Commission otherwise orders, *no change shall be made by any public utility* in any such rate, charge, classification, or service, or in any rule, regulation, or contract relating thereto, *except after sixty days' notice to the Commission and to the public.* Such notice shall be given by filing with the Commission and keeping open for public inspection new schedules stating plainly the change or changes to be made in the schedule or schedules then in force and the time when the changes will go into effect.

16 U.S.C. § 824d(d) (emphasis added). In contrast to § 302(a), § 205(d) does impose a self-executing requirement on utilities: utilities must file their proposed rate schedules with the Commission and may not implement those changes until at least 60 days after filing.[8] We can assume, therefore, that Congress knew how to impose a pre-change filing requirement and intentionally chose not to do so in § 302. *See Russello v. United States,* 464 U.S. 16, 23, 104 S.Ct. 296, 78 L.Ed.2d 17 (1983) (" '[W]here Congress includes particular language in one section of a statute but omits it in another section of the same Act, it is generally presumed that Congress acts intentionally and purposely in the disparate inclusion or exclusion.' ") (quoting *United States v. Wong Kim Bo,* 472 F.2d 720, 722 (5th Cir.1972)) (alteration in original); *Halverson v. Slater,* 129 F.3d 180, 185 (D.C.Cir. 1997) (noting that the *Russello* rule has force where, as here, "the two provisions in question are included within the same legislative enactment").

\*    \*    \*    \*    \*    \*

We should make clear the limitations of our holding. It may be that the Commission could, pursuant to its authority under the first sentence of § 302(a) to prescribe generally applicable rules relating to depreciation accounting, promulgate a substantive rule requiring utilities to obtain approval from the Commission before changing their deprecia-

tion rates for accounting purposes. In promulgating such a rule, the Commission would of course have to comply with the "hearing" prerequisite of the first sentence of § 302(a), with § 302(b)'s requirement of advance notification to State commissions, and with the notice and comment procedures set forth in 5 U.S.C. § 553. And the Commission's rule would still have to withstand scrutiny under the *Chevron* framework. But the "precise question at issue," *Chevron,* 467 U.S. at 842, 104 S.Ct. 2778, would be different from what it was in this case. Instead of asking whether § 302 itself *requires* utilities to gain the Commission's approval before changing their depreciation rates, we would ask whether § 302 *forbids* the Commission from imposing such an obligation on utilities—or at least whether § 302 is ambiguous in that respect. We do not decide that question.

\*    \*    \*    \*    \*    \*

For the foregoing reasons, we grant the petition for review, vacate the Commission's May 1997 and October 1997 orders, and remand for proceedings not inconsistent with this opinion.

*So ordered.*

---

**8.** Section 205(e) gives FERC the authority to conduct a hearing to determine the reasonableness of the proposed rate change and to reject the change if it is found unreasonable. 16 U.S.C. § 825d(e).