Purdy v. City of Nashua, et al.      CV-98-627-JD   04/17/00
                 UNITED STATES DISTRICT COURT FOR THE
                      DISTRICT OF NEW HAMPSHIRE


Linda Purdy

     v.                                    Civil No. 98-627-JD
                                           Opinion No. 2000DNH090
City of Nashua, New Hampshire and
Dolores Bellavance, Director,
Community Services Division


                            O R D E R


     The plaintiff, Linda Purdy, brought suit against her former

employer, the City of Nashua, New Hampshire, and her former

supervisor, Dolores Bellavance.  Purdy alleges federal claims

against the city under the Americans with Disabilities Act, the

Rehabilitation Act, the Family and Medical Leave Act, and state

law claims of intentional infliction of emotional distress,

negligent supervision, wrongful discharge, and breach of

contract.[1]  The city moves for summary judgment as to the federal

claims and for judgment on the pleadings as to the state law

claims.  Bellavance moves for summary judgment as to Purdy's

_____

     [1]The plaintiff also includes a claim, count six, for
"respondeat superior" in which she alleges that the city is
liable for defendant Bellavance's tortious conduct, without
alleging any tortious conduct.  Since respondeat superior is a
theory of vicarious liability, rather than a separate cause of
action, see, e.g., Marquay v. Eno, 139 N.H. 708, 718-20 (1995),
the "respondeat superior" claim is interpreted to apply to the
intentional infliction of emotional distress and wrongful
discharge claims brought against defendant Bellavance.

claim for intentional infliction of emotional distress and for judgment on the pleadings on the claim for wrongful discharge brought against her.

Purdy objects to the city's motion as to her federal claims and her state law wrongful discharge claim, and objects to Bellavance's motion only as to the intentional infliction of emotional distress claim. Purdy states that she does not object to judgment on the pleadings in Bellavance's favor as to the wrongful discharge claim. Purdy omitted counts four, five, six, and eight from her objection to the city's motion, but did not explicitly concede judgment in the city's favor with respect to those claims. It would have been better practice for Purdy to have made her intentions clear rather than leaving the court to infer her intent or spend judicial resources addressing claims she intends to concede in the defendant's favor.

## Standard of Review

"After the pleadings are closed but within such time as not to delay the trial, any party may move for judgment on the pleadings." Fed. R. Civ. P. 12(c). When considering a motion for judgment on the pleadings, the "court must accept all of the nonmoving party's well-pleaded factual averments as true and draw all reasonable inferences in her favor." Feliciano v. Rhode

2

Island, 160 F.3d 780, 788 (1st Cir. 1998). Judgment on the pleadings is not appropriate "'unless it appears beyond doubt that the plaintiff can prove no set of facts in support of h[er] claim which would entitle h[er] to relief.'" Santiago de Castro v. Morales Medina, 943 F.2d 129, 130 (1st Cir. 1991) (quoting Rivera-Gomez v. de Castro, 843 F.2d 631, 635 (1st Cir. 1988)).

In contrast, summary judgment is appropriate when "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c). The party seeking summary judgment must first demonstrate the absence of a genuine issue of material fact in the record. Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986). The record evidence is taken in the light most favorable to the nonmoving party. See Zambrana-Marrero v. Suarez-Cruz, 172 F.3d 122, 125 (1st Cir. 1999). All reasonable inferences and all credibility issues are resolved in favor of the nonmoving party. See Barreto-Rivera v. Medina-Vargas, 168 F.3d 42, 45 (1st Cir. 1999). A party opposing a properly supported motion for summary judgment must present record facts showing a genuine issue for trial. See Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 256 (1986). "[A]n issue is 'genuine' if the evidence presented is

3

such that a reasonable jury could resolve the issue in favor of the nonmoving party and a 'material' fact is one that might affect the outcome of the suit under governing law." Fajardo Shopping Ctr. v. Sun Alliance Ins. Co., 167 F.3d 1, 7 (1st Cir. 1999). Summary judgment will not be granted as long as a reasonable jury could return a verdict in favor of the nonmoving party. See Anderson, 477 U.S. at 248.

Background[2]

Linda Purdy was employed by the city of Nashua, New Hampshire, as an HIV outreach worker from September of 1994 through June of 1998. The outreach position involved providing services to people in the city who are at risk of contracting HIV. Two outreach staff members worked together engaging individuals on the street to educate them about HIV, to provide prevention methods, and to suggest other social services.[3] The job was a full-time position, from eight to five each day, five days per week. Cynthia Langevin was Purdy's immediate supervisor; Joan Schulze was the manager of the public health

---

[2]The factual summary is provided for background purposes only.

[3]Although the city contends that safety considerations required the teaming arrangement, the citations to the record provided do not describe such a safety requirement.

4

department and hired Purdy; and Dolores Bellavance was Director of Community Services and head of Purdy's division.

Purdy suffered from post-traumatic stress disorder, anxiety, and depression and received counseling and medication for her disorder. Despite her treatment, Purdy continued to experience sleep disturbances, depression, and panic attacks. Schulze was aware that Purdy had problems and was taking medication, but says that she did not know her diagnosis. Purdy believes that she told Schulze and Langevin about her disorder and depression diagnoses and told Bellavance in the spring of 1998.

Purdy initially worked part time, from September of 1994 until July of 1995, and then continued as a full-time employee until the end of June of 1998. In her first progress report, Purdy was evaluated as needing improvement in several areas including her observance of work hours and attendance. Those areas had improved to "meets expectations" three months later. The record shows that by June of 1997, Purdy was again having difficulties with attendance which continued until her employment was terminated in June of 1998. She remembers continuing problems with attendance due to her mental health problems. She used all of her sick time and vacation leave for time off due to her mental health problems. Because her mental health issues arose unexpectedly, she was not able to plan for the absences

5

ahead of time.

In February of 1998, Purdy's sister, who was ill with the terminal stages of cancer, entered a hospice program. Her supervisors knew of her sister's illness. Purdy's mental health problems became worse as a result of her sister's illness. Purdy spent time with her sister, when her sister's health permitted, which resulted in unplanned absences from work. The department supervisors, including Bellavance, were critical of Purdy's unplanned absences from work.

Purdy was out of work from March 16 through 20 due to symptoms related to her mental health problems. During that time, Langevin and Schulze called her every day to check on her. Schulze consulted with Marilyn Baron, the Human Resources director, who told Schulze to refer Purdy to the Employee Assistance Program ("EAP"), which Schulze did. Schulze also told Purdy she would need a doctor's note to return to work. Schulze gave Purdy a written warning about her absence without specific approval and saying: "Your failure to report to work, coupled with your apparent abuse of vacation and sick time, place a significant burden and hardship on this department, which greatly impairs our ability to serve the Nashua community." Letter dated 3/21/98. Purdy obtained a note from her doctor giving her permission to return to work on March 23, 1998.

Purdy met with Baron, the human resources manager, as suggested by the EAP, to discuss her eligibility for FMLA leave to spend time with her sister or to cope with her own mental health needs and to see if, under the Americans with Disabilities Act ("ADA"), her work schedule could accommodate her need for time off. Baron questioned Purdy's qualification for FMLA leave and accommodation. Baron also asked for the name of Purdy's therapist which Purdy supplied. Baron gave Purdy a letter on April 2, 1998, explaining the requirements for leave under the Family and Medical Leave Act ("FMLA") and suggesting that Purdy respond to Schulze's warning letter.

Baron wrote to Purdy's therapist, Jo Davidson, on June 2, 1998, informing her that Purdy had been disciplined due to tardiness and absenteeism at work and requesting Purdy's diagnosis and treatment plan and a prognosis of her current condition. She asked if Purdy's condition "substantially limits a life's function" and enclosed a copy of Purdy's job description. Baron also asked about Purdy's work capacity, whether she had any restrictions on her ability to perform essential functions of her job, and whether she would need "reasonable accommodation" to perform the essential functions of her job.

Bellavance called a meeting in late May to address Purdy's

7

absences and other issues about her job.  In the course of the meeting, Bellavance lost her temper and swore at Purdy.  Purdy brought a complaint about Bellavance's behavior to Baron.  Baron remembers that Purdy did not want to file a formal complaint but instead wanted the matter handled informally.  Baron contacted Bellavance and suggested that she apologize to Purdy.  Schulze also contacted Baron about the situation between Bellavance and Purdy, and Baron advised Schulze to stay out of it.  Bellavance apologized to Purdy for her angry outburst at the meeting.

Purdy's therapist, Davidson, did not immediately receive the letter from Baron because it had to be forwarded to her from another office.  She called the human resources office on June 23, 1998, and talked with Gary Diaz, the assistant director.  Davidson asked if she could provide the requested information after July 1 to give her time to meet with Purdy.  Diaz emphasized the urgent need for the information but did not explain that the department's fiscal year began on July 1 or say that the information would not be acceptable after July 1.

On June 26, 1998, Bellavance sent Purdy a letter saying: "Based upon a number of concerns, namely regarding your excessive absenteeism and tardiness, the City of Nashua has decided not to renew the employment agreement, which expires June 30, 1998." Purdy was offered an opportunity "to give her side of the story"

on the morning of June 29. Diaz and Baron attended the meeting with Bellavance and Purdy. Bellavance decided to terminate Purdy's employment and sent Purdy a termination letter notifying her that her one-year contract would not be renewed for the next year.

Schulze and Purdy's coworker felt that her termination was an unexpected event that had a negative impact on the program.

## Discussion

The city moves for summary judgment in its favor on Purdy's claims brought under the ADA, the Rehabilitation Act, and the FMLA. The city also moves for judgment on the pleadings on Purdy's state law claims. Bellavance moves for summary judgment on Purdy's claim of intentional infliction of emotional distress and judgment on the pleadings as to her claim for wrongful termination.

## A. The ADA Claim

Title II of the ADA provides that "no qualified individual with a disability shall, by reason of such disability, be excluded from participation in or be denied the benefits of the services, programs, or activities of a public entity, or be subjected to discrimination by any such entity." 42 U.S.C.A. §

9

12132. "To prevail on an unlawful discrimination claim under the ADA a plaintiff must prove three things by a preponderance of the evidence: first, she must show that she was disabled within the meaning of the Act; second, she must prove that with or without reasonable accommodation she was a qualified individual able to perform the essential functions of the job; and third, she must show that the employer discharged her because of her disability." Criado v. IBM Corp., 145 F.3d 437, 441 (1st Cir. 1998). The burden remains on the plaintiff to prove each element of an ADA claim. See Lessard v. Osram Sylvania, Inc., 175 F.3d 193, 197 (1st Cir. 1999). For purposes of summary judgment, the city does not contest that Purdy was disabled due to her mental health problems, but instead focuses on whether Purdy was qualified to perform essential functions of her job and whether she was terminated because of her disability.

### 1. Qualification

To demonstrate that she was qualified for her job, in the ADA context, Purdy must be able to show "both that she satisfies the prerequisites for the position, that is, that she has the proper training, skills, and experience, and that she could perform the essential functions of her job, either with or without reasonable accommodation." Soto-Ocasio v. Federal Exp.

10

Corp., 150 F.3d 14, 18 (1st Cir. 1998) (citing 29 C.F.R. § 1630.2(m)). "[A] reasonable accommodation may include 'job restructuring, part-time or modified work schedules,' and other similar accommodations." Criado, 145 F.3d at 441 (quoting 42 U.S.C.A. § 12111(9)(B)). An employer is not, however, expected to reallocate essential job functions in order to accommodate an employee's disability. See Soto-Ocasio, 150 F.3d at 20; Laurin v. Providence Hosp., 150 F.3d 52, 56-57 (1st Cir. 1998).

The city contends that Purdy could not perform the essential functions of her job because of her tardiness and absenteeism. It is undisputed that Purdy's regular schedule in the outreach position was for eight hours each day and five days each week. Although Purdy was allowed sick time and vacation leave, she used all of her time and was never able to accrue unused time. The city contends that most jobs require reliable and predictable work attendance, but the city makes no convincing presentation that regular hours and timeliness were a particular essential job function for the outreach position. See Laurin, 150 F.3d at 56-57 (discussing circumstances of deference to employer's determination of job function); Soto-Ocasio, 150 F.3d at 18 n.3 (noting that employer's judgment as to particular essential functions to be given consideration).

Purdy does not dispute that she was absent and late at times

11

without permission and without notifying her supervisor. It is also undisputed that her absenteeism and tardiness were recurrent issues for which she received negative progress reports and warnings. Purdy contends that she requested a reasonable accommodation for her need for leave time to cope with her mental health problems but that her request was denied. She contends that her need for time off could have been reasonably accommodated within her outreach position.

Purdy notes that the city allowed her coworker to start work an hour later than the eight-to-five schedule in order to accommodate the time he arrived at work and also allowed him to take time off for personal matters. Purdy contends that her coworker used more than his allotted leave time. The city also allowed Purdy's replacement outreach worker to take time to accommodate her children's medical needs. Her replacement left the job after a short time, having used more than her allotted leave time. Purdy contends that her absences did not have a negative impact on the outreach program because her coworker covered for her as she did for him when he was absent.

Purdy also contends that the city knew of her disability and her request for an accommodation and failed to determine whether a reasonable accommodation could be made for her needs. The city disputes that she requested an accommodation, but says that any

12

accommodation for her absenteeism and tardiness would not be reasonable because she could not be given open-ended freedom to work when and if she pleased. The city also argues that a leave of absence was not reasonable because Purdy's counselor did not provide her supporting diagnosis and records until after Purdy's employment had been terminated.

An employer has a continuing obligation to provide a reasonable accommodation for a disabled employee. See Criado, 145 F.3d at 445. As part of that obligation, when an employer is aware of an employee's disability and an employee has requested an accommodation, the employer may be expected "'to initiate an informal, interactive process' with the individual seeking accommodation." Soto-Ocasio, 150 F.3d at 19 (quoting 29 C.F.R. § 1630.2(o)(3)). Whether a requested accommodation is reasonable is a fact-intensive inquiry. See Criado, 145 F.3d at 443.

The record presented for summary judgment as to the circumstances surrounding the city's interactions with Purdy during the spring of 1998, does not establish by undisputed facts that the city fulfilled its obligations to assess whether a reasonable accommodation could be made for her disability. Given the accommodations that were made for other outreach workers and Purdy's coworker's assurances that they could cover for each other's absences, the city has not established that no scheduling

13

accommodation would have been possible.[4]  Since the city made little effort to get Purdy's counselor's information before its decision to discharge her or to address the issue after the information arrived, the city cannot fault Purdy for the late arrival of the information.  See Criado, 145 F.3d at 444.

Therefore, as material factual issues remain as to whether Purdy was qualified to perform the essential functions of the outreach job with reasonable accommodation, summary judgment cannot rest on that element of her ADA claim.

2.  Discharge

The city argues that Purdy cannot show that she was discharged because of her disability when her contract was not renewed based on her absenteeism and tardiness.  The city contends, relying on the McDonnell Douglas framework,[5] that its nondiscriminatory reason for discharging Purdy puts the burden on her to show that the stated reason for her discharge was a pretext for discrimination based on her disability.  As Purdy correctly notes, however, the First Circuit has recently ruled

---

[4]As noted above, the city has not established that the outreach position workers could not work alone.

[5]See McDonnell Douglas Corp. v. Green, 411 U.S. 792, 802 (1973).

14

that an ADA claim based on a failure to accommodate a disability does not implicate discriminatory animus or the McDonnell Douglas test. See Higgins v. New Balance Athletic Shoe, Inc., 194 F.3d 252,264 (1st Cir. 1999). Instead, the employee must show "that the employer, despite knowing of the employee's physical or mental limitations, did not reasonably accommodate those limitations; and that the employer's failure to do so affected the terms, conditions, or privileges of the plaintiff's employment." Id.

Upon review of Purdy's job description, provided by the city, Purdy's counselor reported that her only difficulties in performing the job, caused by her mental illness diagnoses, would be with tardiness and absenteeism. The counselor recommended that Purdy be accommodated with a flexible schedule in which she would make up any lost time but would be allowed to take time when necessary, rather than on a planned schedule. Her counselor also said that such a schedule would require Purdy to maintain communication with "an understanding employer." The city did not wait to get the counselor's input, and it has not responded to her recommendations. The record, therefore, does not show whether the city could have reasonably accommodated Purdy's needs as recommended by her counselor.

It is readily apparent that Purdy was discharged because of

15

her absenteeism and tardiness.  She contends that those deficiencies were the result of her mental health disability and the lack of accommodation by the city.  Therefore, a triable issue remains as to whether the city could have provided reasonable accommodation and whether the city's failure to do so caused Purdy to be discharged.

B.   The Rehabilitation Act Claim

"Section 504(a) of the Rehabilitation Act provides that '[n]o otherwise qualified individual with a disability . . . shall, solely by reason of her or his disability . . . be subjected to discrimination under any program or activity receiving Federal financial assistance.'" Tardie v. Rehabilitation Hosp., 168 F.3d 538, 542 (1st Cir. 1999) (quoting 29 U.S.C.A. § 794(a)).  The parties agree that for purposes of the present motion, the standards and requirements for Purdy's claim under the Rehabilitation Act are the same as for her claim under the ADA. See, e.g., id.; Theriault v. Flynn, 162 F.3d 46, 48 n.3 (1st Cir. 1998).  Therefore, for the same reasons discussed in the context of the ADA claim, a trialworthy issue remains as to whether the city discriminated against Purdy based on her disability in violation of the Rehabilitation Act.

16

C.  FMLA Claim

The FMLA, 29 U.S.C.A. §§ 2601-2619, provides substantive rights to eligible employees to take leave time from work under certain circumstances and prohibits interference with those rights and discrimination based on the exercise of FMLA rights. See 29 U.S.C.A. § 2615(a)(1) & (2); Duckworth v. Pratt & Whitney, Inc., 152 F.3d 1, 9 (1st Cir. 1998); Hodgens v. General Dynamics Corp., 144 F.3d 151, 159 (1st Cir. 1998).  In her complaint, Purdy alleges that the city violated § 2615(a)(1) by firing her before it received information from her counselor relevant to her FMLA request.  Purdy also alleges that the city violated § 2612(a)(1)(D) by failing to offer her FMLA leave time in lieu of her use of sick time for the absences which led to her discharge. Accordingly, both of Purdy's claims allege that the city interfered with her right to take leave time under the FMLA.

The city moves for summary judgment on the grounds that Purdy was not improperly denied FMLA leave time because she did not provide certification from her health care provider as to specific issues of her claimed serious health condition.  The city points to 29 U.S.C.A. § 2613(a) that permits employers to require employees to submit certification pertaining to a serious health condition in a timely manner.  The city says that Purdy's counselor's response was not timely and that Purdy was,

17

therefore, properly denied FMLA leave.

Contrary to the city's characterization of the circumstances, the record presented for summary judgment does not show that the city used its "best efforts to obtain such information through the interactive process." To the contrary, the city appears to have written to Purdy's counselor less than a month before she was fired, despite her supervisor's long-standing knowledge of her mental health problems and Purdy's request for leave or accommodation two months previously. The city then made only one ineffective effort to expedite receipt of the information, and that was done within days of Purdy's discharge. The city does not indicate that any of the delay was caused by Purdy. Therefore, there is a material factual dispute related to the city's requirement of the certification information under § 2613 and the timeliness of the response.

The city also contends that it is entitled to summary judgment on Purdy's FMLA claim because she cannot rebut its non-discriminatory motive for discharging her. Since Purdy's complaint alleges interference, rather than discrimination or retaliation, under the FMLA, the city's defense would appear to be a misfire. Cf. Hodgens, 144 F.3d at 160. In response, however, Purdy invokes the proscriptive part of the FMLA, contending that the city retaliated against her for taking FMLA

18

leave time in March of 1998 by warning her and then by discharging her. Such a claim does not appear to be alleged in the complaint, and the court declines to address an issue that is not pled in the complaint.

D.  Intentional Infliction of Emotional Distress

Purdy brings a claim alleging intentional infliction of emotional distress by Bellavance based on Bellavance's conduct toward Purdy during her employment and Bellavance's decision to discharge her. Purdy also claims respondeat superior liability by the city for Bellavance's conduct. Since Purdy does not press the claim against the city, and since well-settled precedent in this court construes New Hampshire's workers' compensation statute as barring such a claim, the city is granted judgment on the pleadings as to that claim. See, e.g., Miller v. CBC Cos., Inc.. 908 F. Supp. 1054, 1068 (D.N.H. 1995).

The workers' compensation statute does not bar a plaintiff from bringing a claim for intentional infliction of emotional distress against a fellow employee. See id. Under New Hampshire law, a claim for intentional infliction of emotional distress must be based on extreme or outrageous conduct that caused the plaintiff severe emotional distress. See Morancy v. Morancy, 134 N.H. 493, 495 (1991). Bellavance argues that Purdy cannot prove

19

that her conduct was extreme or outrageous.

Purdy concedes that a discharge from employment for an improper reason, standing alone, is an insufficient basis for an intentional infliction of emotional distress claim. See Konefal v. Hollis/Brookline Co-op. Sch. Dis., 723 A.2d 30, 33 (N.H. 1998). Instead, Purdy likens Bellavance's treatment of her to persistent workplace sexual or racial harassment that have been found to be actionable. See, e.g., Godfrey v. Perkins-Elmer Corp., 794 F. Supp. 1179, 1187-88 (D.N.H. 1992). Purdy also relies on cases where courts have found intentional infliction of emotional distress when the perpetrator abuses a position of authority or preys on the plaintiff's particular vulnerabilities. See, e.g., Pratt v. Brown Mach. Co., 855 F.2d 1225, 1238-42 (6th Cir. 1988).

Purdy contends that Bellavance intentionally inflicted severe emotional distress by unfairly criticizing her for her absences and tardiness when Bellavance knew she had problems with stress and wanted to spend time with her sister. Specifically, Purdy cites the following actions as intentional infliction of emotional distress: Bellavance accused her, but not her co-worker, of abusing sick time; Bellavance continued to "berate" her for her use of sick time even after Purdy told Bellavance that she needed time off because of stress; and Bellavance

20

criticized Purdy for time she took from work to visit her sister who was terminally ill.[6]  Although Purdy does not cite the incident when Bellavance lost control and yelled and swore at her for her absences after Purdy said she was making bleach kits at home, she contends that Bellavance intensified her confrontations after Purdy complained to the human resources department about the incident.  By that time, Purdy contends, she had informed Bellavance that she had been diagnosed with post-traumatic stress disorder and clinical depression.  She also asserts that Bellavance's "harassment" of her culminated in the decision to discharge Purdy.

Courts have rarely found workplace misconduct sufficiently outrageous to constitute intentional infliction of emotional distress.  <u>See, e.g.</u>, <u>Clark v. Township of Falls</u>, 890 F.2d 611,

_____

[6]Purdy repeatedly says that Bellavance asked her, knowing that her sister was in a hospice program, whether her job or her sister were more important.  In the part of Purdy's deposition cited in support of that statement, Purdy explains that when she asked for flexibility in her schedule to allow her to visit with her sister as her sister's health permitted, she met with resistance from Bellavance whose "attitude" was that Purdy should visit on her own time.  Purdy said she did not find visiting on her own time to be inappropriate, but objected to Bellavance's tone and attitude which was "what, you don't want your job? Spending time with your sister is more important than your job?" Purdy deposition at 52-53.  Therefore, it appears that Bellavance did not make those statements but that Purdy interpreted her tone of voice to reflect that attitude.

21

623 (3d Cir. 1989); Caola v. Delta Air Lines, Inc., 35 F. Supp. 2d 47, 52 (D. Mass. 1999); Hamros v. Bethany Homes and Methodist Hosp., 894 F. Supp. 1176, 1180 (N.D. Ill. 1995); Gallant v. BOC Group, Inc., 886 F. Supp. 202, 210 (D. Mass. 1995). This court has found workplace misconduct actionable when it included both extreme unwarranted actions and discriminatory abuse. See, e.g., Yale v. Allenstown, 969 F. Supp. 798, 800 (D.N.H. 1997) (female police officer's male field training officer repeatedly sexually harassed her and retaliated against her rejection by, among other things, forcing her to take a sunrise written test while he held a gun aimed at her). In a case involving less extreme conduct, the court found a plaintiff "just barely satisfied her burden" where her supervisors engaged in "a series of disturbing verbal commentaries and personal attacks" in which they "continually questioned her abilities and expressed stereotypical attitudes on the issue of whether women should stay at home to take care of their children." Miller, 908 F. Supp. at 1068.

Purdy has not met her burden of showing sufficiently extreme and outrageous conduct by Bellavance to raise a trialworthy issue. Purdy does not dispute that she used all of her accrued leave time and that she failed to get approval for absences or to notify her superiors when she took time. She does not dispute that her work schedule was erratic, nor does she contend that it

22

was inappropriate to require her to attend to her personal matters on her own time. Purdy also does not dispute that others in addition to Bellavance reprimanded her for absenteeism and failure to adhere to office rules and procedures. Instead, Purdy challenges Bellavance's attitude, her tone of voice, and her persistence in addressing Purdy's absenteeism and tardiness. She contends that she informed Bellavance that she had clinical depression and post-traumatic stress disorder, but she does not dispute that Bellavance did not receive medical confirmation of those diagnoses until after Purdy was discharged. Purdy offers little detail in support of her claim that Bellavance's confrontations intensified in retaliation for Purdy's complaint.

Bellavance's conduct in addressing Purdy's perceived misuse of leave time and failure to adhere to absence policies, however insensitive or inappropriate, focused on legitimate employment issues and does not rise to the level of extreme or outrageous workplace harassment that courts have found actionable. See, e.g., Van Stan v. Fancy Colours & Co., 125 F.3d 563, 567-68 (7th Cir. 1997) (discussing cases denying claims "for distress resulting from recognizably reprehensible conduct which has been linked to an employer's legitimate interest"). In addition, Bellavance's decision to discharge Purdy, even if it were improperly motivated or illegal, is not enough to show

23

intentional infliction of emotional distress. See <u>Konefal</u>, 723 A.2d at 33. As many courts have noted, "'mere insults, indignities, threats, annoyances, or other trivialities' which an employee can be expected to endure" do not constitute intentional infliction of emotional distress. <u>Miller</u>, 908 F. Supp. at 1068 (quoting W. Page Keeton, et al., Prosser and Keeton on Torts § 12, at 61 (5th Ed. 1984)). Based on the record Purdy presents, no reasonable jury could find that Bellavance's actions were so extreme or outrageous as to constitute intolerable conduct that is necessary for a claim of intentional infliction of emotional distress.

E.  <u>Wrongful Discharge</u>

The city and Bellavance move for judgment on the pleadings as to Purdy's wrongful discharge claim. Purdy does not contest judgment in Bellavance's favor. Purdy alleges that she was discharged because she asked for accommodation for her mental health disability and because she filed a complaint against her supervisor, Bellavance, for harassment. She also alleges that her discharge violated the certification signed by the mayor that required the city to make reasonable efforts to comply with the ADA. The city contends that the remedies available under the ADA preclude Purdy's wrongful discharge claim.

24

Under New Hampshire law, a wrongful discharge claim requires the plaintiff to prove: "one, that the employer terminated the employment out of bad faith, malice, or retaliation; and two, that the employer terminated the employment because the employee performed acts which public policy would encourage or because he refused to perform acts which public policy would condemn." Wenners v. Great State Beverages, Inc., 140 N.H. 100, 103 (1995) (quotation omitted). When the public policy at issue in the plaintiff's claim is codified and the statute provides a remedy for the policy violation asserted, the statutory cause of action supersedes the common-law claim. See Smith v. F.W. Morse & Co., 76 F.3d 413, 428-29 (1st Cir. 1996) (finding Title VII superseded wrongful discharge claim based on gender discrimination); see also Cooper v. Thomson Newspapers, Inc., 6 F. Supp. 2d 109, 115 (D.N.H. 1998) (finding FMLA superseded wrongful discharge claim based on denial of leave); Nedder v. Rivier College, 944 F. Supp. 111, 121 (D.N.H. 1996) (finding ADA superseded wrongful discharge claim based on disability discrimination).

Purdy asserts a violation of public policy codified in the ADA. She contends, without discussing Smith, supra, that her claim is not superseded by the ADA because she may not be successful in proving that she is an individual with a disability covered by the ADA. Whether Purdy's wrongful discharge claim is

25

superseded by the ADA depends on whether the ADA provides a remedy for a violation of the public policy Purdy asserts, not whether Purdy will be successful in making an ADA claim.[7] See Smith, 76 F.3d at 429. Since her wrongful discharge claim is entirely dependent on whether the city has violated a policy codified by the ADA, by her own admission, her common law claim is superseded by the remedies provided in the ADA. The city is entitled to judgment on the pleadings on Purdy's wrongful discharge claim.

F. Remaining State Law Claims

Purdy does not contest the city's motion for judgment on the pleadings on her state law claims for negligent supervision and breach of contract. The negligent supervision claim is based on allegedly tortious conduct by Bellavance. The only remaining claim against Bellavance, intentional infliction of emotional distress, was resolved in Bellavance's favor. The other allegations appear to restate actions by the city that Purdy has alleged in support of her federal statutory claims and would be superseded by the statutory causes of action. See Smith, 76 F.3d at 429.

_____

[7]Further, if Purdy were not covered by the ADA when she was discharged by the city, it would be difficult for her to show that the city violated a policy codified by the ADA.

26

Purdy's breach of contract claim alleges that she was a third party beneficiary of a contract between the city and the New Hampshire Division of Public Health Services and that the city breached the contract by failing to prevent discrimination by the Division based on her disability. "Third-party beneficiary status necessary to trigger this exception exists where "the contract is so expressed as to give the promisor reason to know that a benefit to a third party is contemplated by the promisee as one of the motivating causes of his making the contract.'" Simpson v. Calivas, 139 N.H. 1, 7 (1994) (quoting Tamposi Assoc. v. Star Mkt. Co., 119 N.H. 630, 633 (1979)); accord McCarthy v. Azure, 22 F.3d 351, 362 (1st Cir. 1994).

Purdy includes no factual allegations about the nature of the contract at issue and nothing that would even suggest that she was intended to be a third-party beneficiary. In addition, since she again alleges discrimination based on her disability, her breach of contract claim would likely be superseded by the ADA.

The city is entitled to judgment on the pleadings on all of Purdy's state law claims.

## Conclusion

For the foregoing reasons, the defendant City of Nashua's motion for summary judgment as to counts I, II, and III is denied, and the motion for judgment on the pleadings as to counts V, VI, VII, and VIII is granted (document no. 18). The defendant Dolores Bellavance's motion for summary judgment as to count IV and motion for judgment on the pleadings as to count VII are granted (document no. 16). Therefore, all claims against Dolores Bellavance are resolved in her favor.

SO ORDERED.

_____
Joseph A. DiClerico, Jr.
District Judge

April 17, 2000

cc: Sheila O'Leary Zakre, Esquire
    Mark T. Broth, Esquire
    Gretchen Leah Witt, Mediator